**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
MAY 20, 2021

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
MAY 20, 2021

*Susan L. Carlson*
SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| In re the Termination of Parental Rights to M.A.S.C., | ) ) ) ) ) ) ) ) | No. 98905-2 |
| A minor child. | | En Banc |
| | | Filed: <u>May 20, 2021</u> |

YU, J.—In this case, we address the requirement that prior to terminating parental rights, the Department of Children, Youth, and Families (DCYF) [1] must prove that all necessary and court-ordered services were "expressly and understandably offered or provided" to the parent. RCW 13.34.180(1)(d). The parent in this case, J.C., contends that DCYF did not tailor its offer of services to accommodate her intellectual disability and, as a result, the services were not understandably offered. [2] Based on the record presented, we agree.

---

[1] DCYF was previously organized as part of the Department of Social and Health Services. *See* RCW 43.216.906. We refer to the agency as DCYF throughout this opinion.

[2] This opinion uses "intellectual disability" to refer to a condition that begins before age 18, persists throughout the person's life, and causes "significant limitations in intellectual functioning and adaptive behavior as expressed in conceptual, social and practical adaptive

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Where DCYF has reason to believe that a parent may have an intellectual disability, it must make reasonable efforts to ascertain whether the parent does in fact have a disability and, if so, how the disability could interfere with the parent's capacity to understand DCYF's offer of services. DCYF must then tailor its offer of services in accordance with current professional guidelines to ensure that the offer is reasonably understandable to the parent.

To determine whether DCYF has fulfilled its duty, the trial court must place itself in the position of an objective observer who is aware of the nature and extent of the parent's intellectual disability, as well as current professional guidelines for communicating with people who have similar disabilities. The court must then determine whether DCYF made reasonable efforts to determine the parent's needs and whether DCYF's offer of services was reasonably understandable to the parent based on the totality of the circumstances.

Applying this objective standard, we hold that DCYF did not carry its burden of proving by clear, cogent, and convincing evidence that it expressly and

---

skills." THE ARC, PARENTS WITH INTELLECTUAL DISABILITIES 1 (Mar. 1, 2011), https://thearc.org/wp-content/uploads/forchapters/Parents%20with%20I_DD.pdf [https://perma.cc/JK68-F8RE]. "Developmental disabilities" is a broader term that includes intellectual disabilities as well as other conditions that do not affect intellectual functioning. *See, e.g.*, RCW 71A.10.020(5). Mental illness is distinct from both intellectual and developmental disabilities and is not implicated here, although the principles we set forth in this opinion may apply in other cases where mental illness or other forms of parental disabilities are at issue.

*In re Termination of Parental Rights to M.A.S.C.*, No. 98905-2

understandably offered or provided all necessary and court-ordered services to J.C. We therefore reverse the order terminating J.C.'s parental rights.[3]

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

J.C. is a parent to M.A.S.C., who was born in October 2016. DCYF first became involved with M.A.S.C.'s life in April 2017 due to suspected abuse or neglect. Although DCYF "no found [sic] evidence of physical abuse," it did find that the family was temporarily living in a small, "cluttered" recreational vehicle with "limited basic utilities." Ex. 3, at 64. J.C. agreed to address the clutter and accepted DCYF's offer of "concrete goods, such as a crib, car seat, diapers, and infant related items." *Id.* DCYF and J.C. also agreed to a plan of safe care, which required J.C. to contact multiple resources for assistance in obtaining medical care and stable housing, meeting M.A.S.C.'s nutritional needs, and enrolling in parenting education.

Over the next several weeks, J.C. began contacting the required resources and enrolling in services. These initial contacts raised concerns about her "lack of cognitive skills to follow through with basic parenting education and the infant's global developmental needs." *Id.* at 65. Previous contacts between J.C. and Oregon child welfare authorities had also indicated that J.C. has "impaired

---

[3] M.A.S.C.'s other parent had his parental rights terminated in the same proceeding, but he is not a party on review.

*In re Termination of Parental Rights to M.A.S.C.*, No. 98905-2

fac[ul]ties" that raised concerns about her ability to parent. *Id.* at 67. In

M.A.S.C.'s case, these concerns were heightened by the fact that he is "medically

fragile" with "very specialized" needs and, therefore, requires regular medical

appointments and consistent care to monitor his condition, to meet his needs, and

to continue evaluating his abilities as he grows up. Verbatim Report of

Proceedings (VRP) (May 9, 2019) at 138; VRP (May 10, 2019) at 256.

On May 4, 2017, DCYF responded to a second referral, this time for

suspected neglect, but not abuse, based on a report that J.C. and M.A.S.C. appeared

and smelled "dirty" when they arrived for an appointment. Ex. 3, at 65. M.A.S.C.

also appeared upset and crying, and J.C. reported to medical staff that she would

sometimes blow marijuana smoke on M.A.S.C. in an attempt to help him sleep and

to cure his ear infections. M.A.S.C. was removed from J.C.'s care that day and

placed in protective custody.

Social worker Peggy Kunz was assigned to M.A.S.C.'s case approximately

two weeks later, on May 18, 2017. At the termination trial, Kunz explained that

"as far as offering services to a family," she is generally looking for the family's

perceived "willingness" to engage, learn, and implement new information about

caring for the child. VRP (May 9, 2019) at 36. Kunz testified that with J.C.,

> [t]he recommendations for services were that she complete a chemical
> dependency assessment and all recommended treatment, that she
> participate in mental health assessment and counseling, a
> psychological evaluation and medications management and follows

4

> physician's recommendations, explore DDD,[4] Developmental Disabled Services as well as Social Security services, regular visitation, parenting education.
>
> THE COURT:  Wait, wait, wait. Slow down. I was following you up to Social Security. What was the next one?
>
> A:  Regular visitation, parenting education, contacting the Department once per month, as well as consents.

*Id.* at 44.

On May 24, 2017, J.C. relocated to Boise, Idaho.  Although she had engaged in several visits with M.A.S.C. since he was removed from her care, J.C. reported that she needed to suspend visits until she could get situated in her new home. Nevertheless, within two months she took the necessary nine-hour bus rides each way to visit M.A.S.C. and attend the dependency hearing in July 2017.

When J.C. returned to Idaho, "she had indicated that during her visit here when she was staying in a hotel the Department got her, she was actually a victim of a crime." *Id.* at 52.  In following up with J.C. on this information, Kunz "sent her an email that had a list of providers that indicated counseling, mental health services, chemical dependency services and parenting services as well as domestic violence and rape crisis information." *Id.*  However, Kunz did not offer J.C. alternative methods for visiting with M.A.S.C., such as FaceTime or Skype,

---

[4] DDD refers to the former Department of Developmental Disabilities, which is now known as the Developmental Disabilities Administration.

*In re Termination of Parental Rights to M.A.S.C.*, No. 98905-2

because in-person visitation is DCYF's "preferred method" and, at least early in the dependency, DCYF was concerned that M.A.S.C. "may be blind." VRP (May 10, 2019) at 235.

An agreed order of dependency was entered on July 19, 2017. The "**Order**" section provided that J.C. was required to complete the following list of "**Services**":

1.  **[J.C.] will demonstrate her ability to live a lifestyle that promotes independent living, good decision making, coping skills, and good health.**

2.  **[J.C.] will increase her positive self-image by strengthening her abilities to support herself and [M.A.S.C.].**

3.  **[J.C.] will demonstrate her ability to enter into positive relationships with other individuals that are safe, stable, free of violence, and free of substances.**

4.  **[J.C.] will pursue stable employment.**

5.  **[J.C.] will pursue stable housing.**

6.  **[J.C.] will pursue educational/vocational opportunities to assist in supporting herself and [M.A.S.C.].**

7.  **[J.C.] will utilize positive community and family supports.**

8.  **[J.C.] will utilize available resources for needed services.**

9.  **[J.C.] will enter only into relationships that are safe and stable.**

10. **[J.C.] will place (above her own needs) a priority on [M.A.S.C.]'s needs for bonding, health, and development.**

6

11.     **[J.C.] will complete a chemical dependency evaluation and follow any and all treatment recommendations.**

12.     **[J.C.] will complete a psychological evaluation and follow any and all treatment recommendations.**

13.     **[J.C.] will participate in behavior counseling and follow any and all recommendations.**

14.     **[J.C.] will participate in medication management (in conjunction with behavior counseling) and follow any and all physician recommendations.**

15.     **[J.C.] will explore and utilize available options for assistance through DDD and SSI[5] qualified providers (as agreed upon through the Department).**

16.     **[J.C.] will demonstrate her ability to build healthy connections with [M.A.S.C.].**

17.     **[J.C.] will demonstrate her ability to keep [M.A.S.C.] safe.**

18.     **[J.C.] will participate in regular visitation with [M.A.S.C.].**

19.     **[J.C.] will acknowledge how her decisions affect [M.A.S.C.].**

20.     **[J.C.] will participate in parenting education with an agreed upon provider and follow any and all recommendations.**

21.     **[J.C.] will contact the Department at least once per month and meet in person with the Social Worker when possible.**

22.     **[J.C.] will complete all Release of Information/Consent forms as requested by the Department and all service providers. Such Release will allow for oral and/or written communication between the Department and service providers.**

---

[5] Supplemental Security Income.

*In re Termination of Parental Rights to M.A.S.C.*, No. 98905-2

Ex. 3, at 72-74. Approximately half of this 22-item list consists of DCYF's "intention for these services" rather than the services themselves. VRP (May 9, 2019) at 45. Nothing in the order indicates whether a particular listed item is a service or an intention; in the trial court's words, DCYF's intentions were "subsumed in those various offered services or requirements." VRP (May 10, 2019) at 219. The record contains no evidence indicating whether or how the difference between intentions and services was explained to J.C.

As the dependency progressed, J.C. made progress with some of the listed items and struggled with others. Social worker Kunz testified that every month, she would contact J.C. and other people regarding J.C.'s case a total of "3 to 11" times by phone, e-mail, and letters, and Kunz had "[n]o question" that J.C. understood "what the Department was looking for as far as improvements in [her] parenting abilities and lifestyle." *Id.* at 220. When asked why she believed that J.C. understood their communications, Kunz testified,

> Through just my assessments in my telephone calls with her, through my correspondence and follow-up telephone calls with her. I would continually go over the Court-ordered services, ask her who she is meeting with, what she has done to complete, to complete that, and she, she would answer my questions, and she would answer them, she would answer them, you know from the question that I asked. The answers seemed reasonable.

VRP (May 9, 2019) at 130.

8

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Kunz also believed that written communications were effective with J.C. because in Kunz's experience in working with people who have intellectual disabilities, sometimes "concrete letters are a good way to express what is needed," and J.C. had been able to communicate and follow instructions regarding "travel arrangements" via e-mail. *Id.* at 116, 118. However, J.C. experienced homelessness in 2017 and 2018, so it is not clear how many of Kunz's letters J.C. received during that time period.

The record contains only one example of Kunz's written offers of services to J.C. The two-page cover letter, which Kunz characterized as "very concrete and clear," is accompanied by five attachments, some of which required action on J.C.'s part, while others provided only information. *Id.* at 117. One of the attachments is a document providing information about the "MEEERS Reunification Criteria," with MEEERS being an acronym for "Motivation (M), Experience (E), Enjoyment (E), Efficacy (E), Resources (R[)], Skills (S)." Ex. 5, at 193, 195. Kunz acknowledged that this document contains "hard words" and is "intended for the social worker to be able to communicate and have conversations" with the parent. VRP (May 9, 2019) at 118. However, Kunz did not review it with J.C. because the final sentence of Kunz's cover letter provided, "If you have any questions, please call met [sic] 509-876-[XXXX]." Ex. 5, at 194. Kunz therefore

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

assumed J.C. would call Kunz if she had questions about the MEEERS

Reunification Criteria.

Another attachment to Kunz's cover letter is a lengthy case plan, providing

in part that J.C.'s "**Objective**" is to "live a lifestyle that is safe, stable, healthy and

provide for all the needs for herself and her child." *Id.* at 201. To accomplish this,

J.C. was to complete the following:

**Task**:

1. [J.C.] shall live a life that promotes independent living, good decision making and coping skills, and good health. [J.C.] will increase her positive self image by strengthening her abilities to support herself and her child and entering into positive relationships with others that are safe, stable, free of violence and substances.
a. [J.C.] will meet regularly with all medical and mental health doctors and be in compliance with any medications and recommendations.
b. [J.C.] will pursue stable employment, housing and educational/ vocational opportunities that help support herself and her child.
c. [J.C.] will utilize positive community and family supports and available resources.
d. [J.C.] will enter into relationships that are safe and stable
e. [J.C.] will place a priority on [M.A.S.C.]'s needs for bonding, health and development above her own
f. [J.C.] will complete a chemical dependency evaluation and follow recommendations
g. [J.C.] will complete a psychological evaluations [sic] and follow recommendations
h. [J.C.] shall participate in behavior counseling in conjunction with any recommended Medications Management.
i. [J.C.] shall explore and utilize options for assistance through DDD and SSI as qualified

2. [J.C.] will build healthy connections with [M.A.S.C.] and keep him safe by participating in regular visits, acknowledging how her

10

decisions affect the child, and participating in parenting education programs with an agreed upon provider.

3. [J.C.] will contact the Department at least once per month and meet in person when possible.

4. [J.C.] will complete all releases of information as requested by the Department and providers.

*Id.*

J.C. continued to struggle with completing services, and on June 29, 2018, DCYF petitioned for termination of her parental rights to M.A.S.C. Relevant here, the petition recited the same 22-item list that was in the dependency order and asserted that every item on the list was a "service" that had "been expressly and understandably offered or provided." Clerk's Papers (CP) at 6-8.

Following a two-day bench trial, the court issued oral rulings. The court noted that the question of whether DCYF had understandably offered or provided all court-ordered and necessary services to J.C. "is the one that's probably been the focus here." VRP (May 10, 2019) at 289. In ruling on that question, the trial court first found that J.C. was "represented by legal counsel throughout this matter" who was responsible for explaining the orders to J.C. *Id.* The court then moved on to J.C.'s mixed progress with the 22-item list of services and intentions in her dependency order and finished by discussing the extent of DCYF's duty:

And you can say, well, why hasn't the Department done more to make sure she connects with those services? Well, you know the Department can only do so much. It takes at least up to a certain

11

point, a requirement that the parent reach out and make some effort, rather than being led by the horse collar to participate in these things.

*Id.* at 291. The court thus ruled that DCYF had met its burden of proving that services had been expressly and understandably offered.

The trial court later issued written findings that were consistent with its oral rulings. The court found that Kunz "repeatedly told" J.C. what she needed to do and that "if the language in the court orders was confusing," then her "attorneys could have, and did, explain the orders." CP at 95. The court also found that Kunz "made every attempt reasonable to ensure the mother had access to services" and "was always available to answer questions about the service plan and frequently did so." *Id.* The court ultimately concluded that "[t]he allegations contained in the Petition as provided in RCW 13.34.180(1) are established by clear, cogent and convincing evidence" and that termination was in M.A.S.C.'s best interests. *Id.* at 98. It therefore terminated J.C.'s parental rights.

J.C. appealed. The Court of Appeals affirmed, reasoning that "[a]lthough there is a lot of fluff in the directives, there is substance that was conveyed in language that was understandable" and that "there is no indication in the record that she had any communication difficulties that resulted in her failure to understand what was expected of her." *In re Dependency of M.A.S.C.*, No. 36857-2-III, slip op. at 7 (Wash. Ct. App. July 21, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/368572_unp.pdf. We granted J.C.'s

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

motion for discretionary review and accepted for filing an amici brief in her

support by the King County Department of Public Defense, Disability Rights

Washington, the American Civil Liberties Union of Washington, the Mockingbird

Society, and the Washington Defender Association (DPD et al.). We now reverse.

ANALYSIS

A.     Whether DCYF has fulfilled its duty to expressly and understandably offer
       services to a parent with an intellectual disability must be measured against
       an objective standard based on current professional guidelines

This case is about the statutory requirement that in a proceeding to terminate

parental rights, DCYF must prove that all court-ordered and necessary services

were "expressly and understandably offered or provided" to the parent. RCW

13.34.180(1)(d). This statutory requirement must be interpreted consistently with

constitutional principles because "[p]arents have a fundamental liberty interest in

the care, custody, and management of their children." *In re Welfare of D.E.*, 196

Wn.2d 92, 102, 469 P.3d 1163 (2020). Likewise, children have "'a vital interest in

preventing erroneous termination of their natural relationship'" with their parents.

*Id.* at 103 (quoting *Santosky v. Kramer*, 455 U.S. 745, 760, 102 S. Ct. 1388, 71 L.

Ed. 2d 599 (1982) (plurality opinion)).

To protect the vital interests at stake, "the burden of proof in a termination

trial is on the Department and should never be shifted to the parent." *Id.* DCYF's

burden of proof is "clear, cogent, and convincing evidence." RCW

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

13.34.190(1)(a)(i). "This is the equivalent of saying that the ultimate fact in issue must be shown by evidence to be 'highly probable.'" *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973) (quoting *Supove v. Densmoor*, 225 Or. 365, 372, 358 P.2d 510 (1961)).

The parties in this case correctly agree on a number of points, at least in the abstract. Both parties recognize as a general matter that DCYF "is required 'to identify a parent's specific needs and provide services to meet those needs,'" and that "[w]ithin the prerequisite of RCW 13.34.180(1)(d), the services must be tailored to the needs of the individual." *In re Parental Rights to D.H.*, 195 Wn.2d 710, 727, 464 P.3d 215 (2020) (quoting *In re Parental Rights to I.M.-M.*, 196 Wn. App. 914, 924, 385 P.3d 268 (2016)). And DCYF does not deny that it must tailor its offer of services, as well as the services themselves, to ensure that the offer is "expressly and understandably" made to the parent in light of their individual needs. RCW 13.34.180(1)(d).

Despite these points of agreement on the underlying legal principles, the parties disagree sharply on their application to this case. We therefore take this opportunity to add clarity and substance to the requirement that DCYF must tailor its offers of services to accommodate the needs of parents with intellectual disabilities. In doing so, we address the steps DCYF must take, as well as the analysis trial courts should apply.

14

Initially, where DCYF has reason to believe that a parent may have an intellectual disability, it must make reasonable efforts to ascertain the extent of the disability and how it could interfere with the parent's ability to understand and benefit from DCYF's offer of services. This initial requirement is necessary to ensure that DCYF "cannot escape its obligation to provide coordinated services by inexplicably failing to investigate the likelihood a parent is developmentally disabled." *I.M.-M.*, 196 Wn. App. at 924.

Next, if reasonable efforts reveal that the parent does have an intellectual disability, then DCYF must tailor its offer of services to ensure that the offer is reasonably understandable to the parent. This tailoring must be informed by current professional guidelines and must accommodate the individual parent's needs rather than relying on broad-based or untested assumptions about the needs and abilities of people with intellectual disabilities. *See In re Dependency of H.W.*, 92 Wn. App. 420, 429, 961 P.2d 963 (1998).

If efforts to reunify the family are unsuccessful and a termination trial becomes necessary, then the trial court's role in evaluating whether DCYF has understandably offered services to the parent is to apply a consistent, objective standard that accounts for the individual circumstances of each case. Consistent application of an objective standard is both essential and challenging because "this is the type of inquiry that gives judges an unusual level of discretion and is

15

particularly vulnerable to subjective judgments." *In re Welfare of M.B.*, 195 Wn.2d 859, 870, 467 P.3d 969 (2020). To apply the correct standard, the trial court must place itself in the position of an objective observer who is aware of the nature and extent of the parent's intellectual disability, as well as current professional guidelines for communicating with people who have similar disabilities. The court must then determine whether DCYF's offer of services was reasonably understandable to the parent based on the totality of the circumstances.

B.      DCYF did not produce sufficient evidence to sustain its burden of proving that it expressly and understandably offered services to J.C.

Having set forth the appropriate analytical framework, we must now apply it. "Our role in reviewing a trial court's decision to terminate parental rights is limited to assessing whether substantial evidence supports the trial court's findings." *D.H.*, 195 Wn.2d at 718. In light of the objective analysis set forth above, we hold that in this case, there is not substantial evidence in the record to support the trial court's finding that DCYF fulfilled its duty to understandably offer J.C. all necessary and court-ordered services.

First, there is no question that DCYF had reason to believe that J.C. might have an intellectual disability. Quite early in this dependency, DCYF had access to reports from J.C.'s previous contacts with child welfare authorities in Oregon that indicated a possible disability, and her initial efforts to contact services in Washington also raised concerns. Moreover, when the order of dependency was

*In re Termination of Parental Rights to M.A.S.C.*, No. 98905-2

entered, the agreed facts stated that J.C. was "clearly struggling with her cognitive faculties." Ex. 3, at 66. This information was more than enough to trigger DCYF's duty to take additional steps to ascertain and accommodate her needs.

Nevertheless, social worker Kunz testified that she never obtained a clinical diagnosis or otherwise ascertained the extent of J.C.'s disability because J.C. did not "follow through" on Kunz's recommendation that she participate in an intellectual disability evaluation for a "sustained amount of time." VRP (May 10, 2019) at 217-18. Kunz testified that she personally has specialized training in "working with clients with special needs to include developmental disabilities" and that she recognizes that every person requires "an assessment of need . . . because every person is different." VRP (May 9, 2019) at 115-16. However, she did not testify that she is qualified to diagnose intellectual disabilities, nor did she testify that she attempted to do so in J.C.'s case. And while there is a diagnostic assessment in the record, it assesses psychiatric and mental health issues, not intellectual disabilities. DCYF thus never determined whether J.C. in fact has an intellectual disability.

DCYF contends that J.C.'s failure to obtain an appropriate evaluation prevented DCYF from fulfilling its duty to ascertain and accommodate her intellectual disability, if indeed she has one. However, Kunz did not testify as to how, exactly, she offered an intellectual disability evaluation to J.C. beyond what

17

is described in the factual background above, nor did Kunz testify as to the details of her own efforts to obtain such an evaluation for J.C.

It is not clear that J.C. understood how important an intellectual disability evaluation would be to obtaining appropriate services and maintaining a relationship with her child. This could have been especially challenging for a person in J.C.'s position to appreciate because Kunz recommended that J.C. engage in a lengthy list of services (and aspirational intentions), and it is not clear that she provided J.C. with a method of identifying and prioritizing the most important ones. Based on the information in the record, we cannot say that DCYF made sufficient reasonable efforts to ascertain the extent of J.C.'s intellectual disability and how it might affect her capacity to understand DCYF's offers of services.

With this background, it should not be surprising that there is no substantial evidence to prove that DCYF tailored its offers of services in accordance with current professional guidelines to make the offers reasonably understandable to J.C. Indeed, DCYF did not present evidence of what the applicable current professional guidelines would be. Such evidence is essential because judges and attorneys do not have specialized training in communicating with individuals with intellectual disabilities and, therefore, cannot reliably determine what is appropriate and understandable in that context. For example, in this case the Court

18

of Appeals was able to determine what services J.C. would be required to complete

based on the 22-item list that originally appeared in the dependency order because

"[a]lthough there is a lot of fluff in the directives, there is substance that was

conveyed in language that was understandable." *M.A.S.C.*, No. 36857-2-III, slip

op. at 7. But judges are trained to excel in reading comprehension and to draw fine

distinctions between subtly different concepts. The average parent is not, and there

is certainly no evidence in the record showing that a person with an intellectual

disability comparable to J.C.'s should have understood DCYF's directives.

Despite the lack of evidence needed to satisfy the objective standard that we

set forth in this opinion, DCYF appears to contend that it satisfied its burden of

proof because the evidence shows that J.C. did in fact understand its offers of

services. For purposes of this opinion, we may assume without deciding that

substantial evidence of a parent's subjective understanding could absolve DCYF of

its duty to accommodate the parent's intellectual disability. However, the record in

this case does not contain such evidence.

DCYF emphasizes the fact that J.C. did not testify, and the Court of Appeals

opinion notes that there was no evidence that J.C. did not understand DCYF's

offers of services. *Id.* at 1, 5, 7. But that is not the correct analytical approach. It

is DCYF's burden to prove that it satisfied all the necessary elements for

termination, and the burden cannot be shifted onto a parent to testify or otherwise

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

disprove any of the elements. J.C. was not required to prove that DCYF's offers of services were not understandable; it was DCYF's burden to prove that they were.

DCYF also points to the trial court's findings that J.C. was represented by appointed counsel throughout the proceedings who could explain the court-ordered services to her, and that Kunz was also available to answer J.C.'s questions. It is certainly true that J.C. had counsel throughout the proceedings, but all parents in termination proceedings are entitled to appointed counsel if needed. RCW 13.34.090(1)-(2); *M.B.*, 195 Wn.2d at 867. Regardless of the parent's attorney's duty to communicate with their client, DCYF must fulfill its own duty to understandably offer services to a parent facing terminating. RCW 13.34.180(1)(d).

It is also true that there is evidence that Kunz was available to answer J.C.'s questions and that she did so on at least some occasions. However, DCYF cannot place the burden on a parent with a disability to guide DCYF into fulfilling its duty to understandably offer services. As amici correctly note, "Communicating with social workers is incredibly fraught for any parent trying to navigate the child welfare system—but for a parent who fears being judged based on their disability, it can be particularly difficult to speak up and announce that she is struggling to understand." Br. of Amici Curiae DPD et al. at 16. Being available to answer questions is important, but it is not the same as understandably offering services in

20

the first place and reducing the need for a parent with a disability to seek clarification.

Finally, DCYF points to testimony by social worker Kunz that she was certain J.C. understood what Kunz was attempting to convey and that J.C.'s failure to complete the necessary services demonstrated a lack of effort rather than a lack of understanding. The problem with relying on this testimony is that Kunz's subjective belief about J.C.'s level of subjective understanding simply does not fit into the objective analysis that courts must apply in this context. Indeed, DCYF's reliance on Kunz's testimony in this case well illustrates why an objective standard is needed.

Kunz did not testify that she believed J.C. understood their communications based on clinical evaluations of J.C.'s intellectual abilities and relevant professional guidelines. Instead, Kunz believed J.C. understood her because (1) Kunz spoke with J.C. often and repeated herself frequently, (2) J.C. was able to provide reasonable answers to factual questions about who she was seeing and what she was doing to complete services, and (3) J.C. was able to ask some questions and follow up on some services, at least to some extent. None of this testimony is proof that DCYF's offers of services were reasonably understandable to J.C.

21

If a method of communicating is ineffective, frequent repetition does not make it more effective. And neither J.C.'s ability to provide reasonable answers to Kunz's questions nor her ability to partially follow up with services proves that J.C.'s suspected intellectual disability does not exist or does not require accommodation. It proves only that if J.C. does have an intellectual disability, it is not obvious or profound. Holding that this is sufficient evidence to show that DCYF fulfilled its duty would wrongfully reinforce the belief that all disabilities are profound and visible, and that individuals with less visible or invisible disabilities do not succeed solely because they are not trying hard enough.

We know that this belief is inaccurate because some individuals with relatively severe intellectual disabilities that do require accommodation may nevertheless learn to "'mask[]'" their disabilities in ordinary interactions by reading social cues and acquiring significant "adaptive skills." *I.M.-M.*, 196 Wn. App. at 918. Nevertheless, the belief that only visible disabilities require accommodation persists as just one example of how "parents with disabilities and their children face significant discrimination based largely on ignorance, stereotypes, and misconceptions." NAT'L COUNCIL ON DISABILITY, ROCKING THE CRADLE: ENSURING THE RIGHTS OF PARENTS WITH DISABILITIES AND THEIR CHILDREN 68 (2012), https://www.ncd.gov/sites/default/files/Documents/

*In re Termination of Parental Rights to M.A.S.C.*, No. 98905-2

NCD_Parenting_508_0.pdf [https://perma.cc/B2B3-CY2G]. We do not condone it.

DCYF may be correct that the record does not compel a finding that J.C. has an intellectual disability that prevented her from understanding DCYF's offers of services. But, as DCYF's own briefing states, "[T]he question is not whether the evidence may have supported other findings of fact, but whether the evidence in the record supports the trial court's findings." Answer to Mot. for Discr. Review at 12. Here, the answer is no. There is not sufficient evidence in the record to prove by clear, cogent, and convincing evidence that DCYF made reasonable efforts to fulfill its duty to expressly and understandably offer all necessary and court-ordered services to J.C.

C.      We must reverse the order terminating J.C.'s parental rights

Having determined that DCYF did not carry its burden of proof at the termination trial, we must consider the appropriate remedy. Reversing a termination of parental rights risks disrupting any stability a child may have achieved since the termination trial, and we do not make such decisions lightly. However, "the preservation of families is a paramount interest shared by the parents, the child, and ultimately, the Department." *D.E.*, 196 Wn.2d at 103. Therefore, where the record shows that a parent-child relationship has been erroneously terminated, reversal is appropriate.

23

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

A termination is certainly erroneous where DCYF did not fulfill its duty to understandably offer services to the parent. Absent sufficient evidence proving that DCYF fulfilled this duty, it is not possible for a court to determine why efforts to reunite the family were unsuccessful. Perhaps the parent was unwilling or unable to remedy their deficiencies. Or perhaps the parent was capable of improvement but struggling to understand precisely what they must do. Both situations are frustrating and potentially devastating for those involved, but there is a world of difference between them. In the former situation, a parent-child relationship may be legally and permanently terminated, while in the latter situation, the parent-child relationship may be preserved with persistent effort and the application of sound professional guidance.

The record in this case provides many examples of situations in which we cannot determine why J.C. did not complete the services DCYF offered. For instance, DCYF determined that J.C. must participate in "evidence-based" parenting classes that require an extended time commitment because "it takes time to talk with the parents and to watch them demonstrate and then to go back and to, to reiterate areas of need and to work with that parent and then continue to watch them demonstrate those needs." VRP (May 10, 2019) at 231. J.C. did not do so, choosing instead to participate in a parenting class that was "not evidence-based," which DCYF determined was inadequate to remedy her parental deficiencies.

24

VRP (May 9, 2019) at 132. Based on the record, there is no way to know why J.C. made this choice. Was she unwilling to make the effort, as DCYF contends? Or did she not understand and appreciate the difference between parenting classes that are "evidence-based" and "not evidence-based"?

Understandable offers of services are essential to giving a parent a meaningful opportunity to remedy their parental deficiencies and preserve their parent-child relationship. Therefore, without sufficient evidence that DCYF understandably offered all court-ordered and necessary services, "[o]nly upon a showing of futility will a termination order be upheld." *I.M.-M.*, 196 Wn. App. at 917. In this case, DCYF suggests, but does not explicitly argue, that further efforts would have been futile, and the record does not establish futility. We must reverse the order terminating J.C.'s parental rights.

CONCLUSION

While every parent facing termination is entitled to understandable offers of services to remedy their parental deficiencies, parents with intellectual disabilities may require accommodations that other parents may not. In this case, DCYF did not prove by clear, cogent, and convincing evidence that it made sufficient efforts to ensure that its offers of services were reasonably understandable to J.C. in light of her potential intellectual disability. We therefore reverse the order terminating her parental rights.

25

_____
Yu, J.

WE CONCUR:

_____
González, C.J.

_____
Stephens, J.

_____
Johnson, J.

_____
Gordon McCloud, J.

_____
Madsen, J.

_____
Montoya-Lewis, J.

_____
Owens, J.

_____
Whitener, J.