IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of:<br><br>J.J.,<br><br>a Minor Child. | No. 84026-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, J. — After a fact-finding trial, Mr. J's parental rights were terminated. He appeals, contending the Department of Children, Youth, and Families failed to meet its burden of proof. Because several of the court's findings of fact underlying the ruling on termination are unsupported by substantial evidence, we reverse.

FACTS

In July 2017, J.J. was removed from his parents' care pursuant to a shelter care hearing order, and the Department of Children, Youth, and Families[1] (the Department) filed a dependency petition. In November of the same year, both J.J.'s mother (Ms. F)[2] and father (Mr. J)[3] agreed to an order of dependency.

---

[1] During the dependency, the Department of Social and Health Services was renamed the Department of Children, Youth, and Families.

[2] The mother is not a party to this appeal.

[3] The father's name is spelled several different ways throughout the record and briefing. Mr. J identifies himself only by a single last name starting with "J." We use "Mr. J" to match his self-identification.

On March 18, 2021, the Department filed a petition to terminate the parental rights of both parents. A trial was held from March 9 through March 21, 2022, after which the court granted the termination petition and entered findings. Mr. J timely appealed.

ANALYSIS

Mr. J challenges the termination of his parental rights on two bases. First, he contends the Department did not meet its burden to prove all statutory factors by clear, cogent, and convincing evidence. Second, he alleges the Department failed to prove by a preponderance of the evidence that termination was in J.J.'s best interests.

Parents have a fundamental liberty interest in caring for their children, therefore, a court "may not terminate a parent's rights without showing that the parent is currently unfit to parent the child in question." In re the Parental Rights to B.P, 186 Wn.2d 292, 312-13, 376 P.3d 350 (2016); see also In re Dep. of Schermer, 161 Wn.2d 927, 941, 169 P.3d 452 (2007) ("Parents have a fundamental liberty interest in the care and welfare of their minor children"). To terminate parental rights, the Department must prove six statutory prerequisites by clear, cogent, and convincing evidence, and, if these statutory elements are met, there is "an implicit finding of unfitness." Id. at 313. The six elements are:

1. The child is dependent.

2. The court has entered a dispositional order.

3. The child has been out of the custody of the parent for at least six months.

4. All services ordered and all necessary services have been "offered or provided."

5. "[T]here is little likelihood that conditions will be remedied" in the near future.

6. Continuing the parent-child relationship "clearly diminishes the child's prospects for early integration into a stable and permanent home."

RCW 13.34.180(1)(a)-(f). If the court finds all six elements are met, it must then determine "whether termination is in the best interests of the child." In re Dep. of A.M.F., 23 Wn. App. 2d 135, 147, 514 P.3d 755 (2022).

When reviewing the trial court's findings of fact in a termination proceeding, this court upholds the findings "so long as they are supported by substantial evidence in the record." B.P., 186 Wn.2d at 313. "Substantial evidence is evidence sufficient to persuade a fair-minded rational person of the truth of the declared premise." In re Welfare of A.B., 181 Wn. App. 45, 59, 323 P.3d 1062 (2014). However, because the Department's burden of proof is higher in termination proceedings, "substantial evidence must demonstrate that fact is 'highly probable.'" A.M.F., 23 Wn. App. 2d at 141 (internal quotation marks omitted) (quoting In re Welfare of Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). On appellate review, this court does not re-weigh evidence nor make credibility determinations. A.B. at 60.

I. Likelihood That Conditions Will Be Remedied in the Near Future

Mr. J challenges the trial court's finding that he would be unable to remedy his parental deficiencies in the near future. RCW 13.34.180(1)(e) requires the

Department prove by clear, cogent, and convincing evidence that "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." See also B.P., 186 Wn.2d at 312. The "near future" is based "on the age of the child and the circumstances of the child's placement." In re Welfare of C.B., 134 Wn. App. 942, 954, 143 P.3d 846 (2006). "When it is eventually possible, but not imminent, for a parent to be reunited with a child, the child's present need for stability and permanence is more important and can justify termination." Id. at 958-59. As such, there must be more than a mere "theoretical possibility" of improvement in the near future. Id. Here, the court determined the "near future" for J.J. was three months.

In its petition to terminate the parent-child relationship, the Department alleged Mr. J's parental deficiencies were: unresolved mental health issues, concerns about excessive marijuana use to cope with untreated mental health conditions, and inadequate parenting skills. To remedy these deficiencies, Mr. J was ordered to establish paternity and complete the following services: random urinalysis (UA) testing including EtG[4] screening once per week for 60 days, a psychological evaluation with a parenting component and compliance with any treatment recommendations, and Project SafeCare along with any services recommended by the program provider.

Mr. J completed a psychological evaluation with a parenting component, and it was recommended that he complete a Department-approved parenting class, such as the "Incredible Years," initiate an appointment with a medication

---

[4] Urine EtG (ethylglucuronide) screening is used to detect alcohol.

provider, secure safe and stable housing, and continue supervised visits with J.J. The Department conceded that Mr. J established paternity and completed a psychological evaluation with a parenting component. It also conceded the Department did not refer Mr. J to Project Safe Care; Department social worker Jaida Allen-Piilani's testimony reflected that Mr. J could not have participated in the program without such a referral. The court's findings demonstrated that Mr. J had safe and stable housing with his family and was in the process of "accessing Section 8 housing." Mr. J had enrolled in the Incredible Years program in January 2022; the program lasts 18 weeks and, at the time of trial, the course was "going into week eight," according to program facilitator Ariel Thompson, who further testified that Mr. J was in compliance. At the time of trial, Mr. J had completed four UAs; two of which were free of all substances, the other two were positive for alcohol only. However, at the conclusion of the termination proceedings, the court made no findings regarding whether Mr. J had complied, or not, with the UA requirement.

In briefing and at oral argument, the Department contended that Mr. J's participation in medication management, as recommended pursuant to his psychological evaluation, "could not be verified by DCYF." Counsel for the Department insisted at oral argument that there was no evidence to suggest Mr. J was participating in medication management other than his own testimony.[5] When asked specifically as to whether the inability to confirm Mr. J's assertions regarding medication management was based on a response from the clinic that

---

[5] Wash. Court of Appeals oral argument, In re Dependency of J.J., No. 84026-6-I (Jan. 11, 2023), at 15 min., 12 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023011181/?eventID=2023011181.

Mr. J was not treated by that practice, or a lack of response from the purported treatment provider, counsel for the Department affirmatively stated, "the first part, that, he was not . . . there was no patient records indicating he was being treated there."[6]  We assume that counsel did not deliberately misrepresent the record to this court, but either lacked insight into, or mistakenly recalled, the evidence she herself presented at trial as counsel for the Department.  Regardless, the Department's contentions on appeal are directly and repeatedly contradicted by the record.  Mr. J made multiple reports to Department staff that he was seeing a Dr. Brown for diagnosis and ongoing management of psychiatric medication.  For example, Department supervisor Julie DeCamp testified that she was unable to complete a release of information (ROI) because Mr. J did not know the name of the organization where Dr. Brown practiced.  She "followed up with him after the meeting to try to make some efforts to get information so we could try to verify whether he was working with the psychiatrist that he had named."  No further testimony was provided on this issue by DeCamp.

Allen-Piilani testified that, "I've been able to verify that Mr. [J] attended three monthly psychiatric appointments with his doctor since I've been on the case."  Allen-Piilani does not explicitly name Dr. Brown, but on cross examination she agreed that Mr. J signed a ROI for Dr. Brown.  Further, Allen-Piilani's service letter dated January 24, 2022 expressly instructs Mr. J to "[c]ontinue seeing your medication management provider" and specifically sets out the full name of the doctor and clinic, also noting the city where the clinic is located.  This testimony

---

[6] Wash. Court of Appeals oral argument, In re Dependency of J.J., No. 84026-6-I (Jan. 11, 2023), at 15 min., 39 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023011181/?eventID=2023011181.

by Allen-Piilani, the Department's own witness, directly contradicts its assertion to this panel on appeal that the clinic denied Mr. J was being treated there.

Additionally, the Department's third amended witness and exhibit list reflects that the Department expected to call a records custodian or Dr. Brown at trial "to testify in support of entry of treatment records as business records," which is at least suggestive that the Department had some records from the clinic in its possession. The Department also filed a notice of intent to compel release of records from "King County Public Health-Belltown/Downtown Location" on March 4, 2022. The court granted the motion on March 21, 2022.[7] Based on the evidence in the record, particularly the explicit testimony by Allen-Piilani that she had verified Mr. J had seen a psychiatrist "at least three times" and had directed him in a service letter to continue with the care provided by Dr. Brown, it is clear that Mr. J was participating in medication management at the time of trial or, at a minimum, that the Department had the necessary information to obtain records to verify his claim.[8] Contrary to the Department's unambiguous assertion at oral argument, there is no evidence in the record before us that suggests the relevant provider reported that Mr. J was not a patient. In fact, it explicitly demonstrates the opposite; that the Department accepted that he was under the care of Dr. Brown at least to the extent that it directed him in a service letter to continue with that treatment.

---

[7] Trial began on March 9 and ended on March 21, with the order terminating rights filed on April 1, 2022.

[8] "'[T]he burden of proof in a termination trial is on the Department and should never be shifted to the parent.'" In re the Parental Rights to M.A.S.C., 197 Wn. 2d 685, 698, 486 P.3d 886 (2021) (quoting In re Welfare of D.E., 196 Wn.2d 92, 103, 469 P.3d 1163 (2020)).

At trial, the only service the court found Mr. J had not yet completed was the Incredible Years program, recommended pursuant to evaluation by Dr. Steve Tutty.[9] This service could have been completed within the timeframe the court had determined represented J.J.'s near future. Thompson described Mr. J "as engaged;" he had not missed any classes and was "consistently on camera,"[10] he was "absorbing the material," and his responses to questions were directly related to the question asked. The trial court's conclusory finding that "there is no basis to find that Mr. [J] has the ability to remedy his parental deficiencies within a year, let alone three months" is unsupported by substantial evidence, much less to a degree that renders this fact "highly probable." Even under our deferential standard of review, there is insufficient evidence to justify termination of Mr. J's fundamental liberty interest in parenting J.J. A.M.F., 23 Wn. App. 2d at 141 ("substantial evidence must demonstrate that a fact is 'highly probable'" when analyzing termination of parental rights) (internal quotation marks omitted) (quoting Sego, 82 Wn.2d at 739).

II.    Unfitness Based on Lack of Insight into Mental Health Conditions

Mr. J also contends the finding that he is currently unfit to parent is unsupported by substantial evidence. He argues that his mental health

---

[9] While the Department also contends Mr. J had not yet completed the required 60 days of UAs, the court made no finding as to whether this service had been completed or not. Again, the Department bears the burden to demonstrate unfitness. We review the court's findings for substantial evidence; it necessarily follows that we cannot determine if a finding is supported by substantial evidence if no finding is made in the first place. "'It is improper for an appellate court to ferret out a material or ultimate finding of fact from the evidence presented.'" In re Welfare of Woods, 20 Wn. App. 515, 517, 581 P.2d 587 (1978) (quoting Wold v. Wold, 7 Wn. App. 872, 876, 503 P.2d 118 (1972)). However, even if Mr. J had failed to complete the required UAs, he could have completed 60 days of UAs within J's near future of 3 months.

[10] The program was provided in an online format.

conditions and other circumstances were not so severe that he was unable to safely parent J.J. Mr. J also alleges that the court failed to "make the required causative connection between [his] mental health issues and proof of an unfitness to parent."

To demonstrate unfitness, "the State must show that the parent's deficiencies make [them] incapable of providing 'basic nurture, health, or safety.'" B.P., 186 Wn.2d at 313 (internal quotation marks omitted) (quoting A.B., 181 Wn. App. at 61). "Identifying parenting deficiencies is not the equivalent of proving parental unfitness" sufficient to terminate a parent's rights. A.B., 181 Wn. App. at 60, 61.

A.    Connection Between Mental Health and Ability to Safely Parent

Mental illness alone is insufficient to demonstrate parental unfitness. In re Dep. of T.L.G., 126 Wn. App. 181, 203, 108 P.3d 156 (2005). "Parents before the court in dependency proceedings rarely come without significant difficulties." Id. However, the court may consider "behavior manifesting mental illness within the totality of the circumstances;" if a parent's "mental illness renders the parent unable to understand or meet the needs of the child," their rights may be terminated. In re Welfare of H.S., 94 Wn. App. 511, 528, 973 P.2d 474 (1999). In determining if a parent is unfit, their "lack of insight into their condition may be considered." Id.

For example, in T.L.G., the psychological evaluator "made no assessment of parenting deficiencies, and he did not connect the need for [mental health] treatment to parenting ability." 126 Wn. App. at 204. There was no parenting

evaluation or testimony that connected the mental health conditions of the parents to any parenting deficiencies. Id. (analyzing in the context of whether services would have been able to correct parental deficiencies). In contrast, in H.S., "the cumulative testimony presented clear, cogent and convincing evidence of the inability of these parents to recognize and respond to their child's needs" due to mental illness; the parents were "unable to understand or pick up on a child's cues as to basic needs," unable to follow parenting instructions, suffered from "suicidal tendencies," and had an "inability to put the child's needs before their own," all of which supported a finding of unfitness. 94 Wn. App. at 529. In A.B., Division Two of this court analyzed whether a parent's cognitive impairments rendered her unable to safely parent; the court held that while the "impairments may pose a risk of harm to A.B. due to an inability to identify subtle dangers . . . it is not highly probable that A.B. will be harmed" or that the mother would be unable to provide for the child's basic needs. 181 Wn. App. at 64. "Cognitive impairments that result in a parent having difficulty learning specific aspects of parenting but that do not present an immediate or severe risk to the child's safety are not sufficient to render a parent currently unfit." Id. at 64-65.

Here, DeCamp testified that she uses a "safety framework tool" to assess 17 safety threats in working with families throughout a dependency case, including with J.J. and his parents. The court considered DeCamp's opinions as expert testimony. She opined that Mr. J had untreated mental health concerns that impacted J.J.'s safety, which had not been addressed as of April 2021. DeCamp testified the "main" safety threat she consistently identified was "safety

threat number 5, which is the caregivers will not or cannot control their behavior and it impacts child safety." DeCamp stated that Mr. J's mental health condition "has presented in terms of unstable behaviors" and she observed an "inability to meet [J.J.'s] needs for his specific behaviors" during supervised visitation.

Tutty conducted a psychological evaluation of Mr. J with a parenting component, his report was submitted at trial, and he testified after the court qualified him as an expert witness. Tutty testified that Mr. J "was aware of safety and surroundings of that environment" during the parent-child observation and said, "Overall, it was a positive observation," and "it was a fairly decent parent-child visit." Tutty stated that he "didn't see any red flags" when observing Mr. J and J.J. interact, and determined that Mr. J "remains at a low to moderate risk toward adversely affecting the safety and welfare of his child at this time and in the near future." However, Tutty also testified that Mr. J's scores for the personality assessment inventory and for the child abuse potential inventory were invalid because Mr. J "engaged in what's called positive impression management; he was concerned about how he was going to be viewed," and "minimiz[ed] minor shortcomings most people would admit." "The practical implications" of these invalid scores, according to Tutty, "are that there could be deficits in psychopathology or parenting that we just don't know," and Tutty was unable to fully assess risk.

Allen-Piilani also testified regarding Mr. J's mental health, and was qualified as an expert as to mental health and the interplay between mental health and parenting ability. She was asked "how does a mental health concern

affect Mr. [J's] parenting ability?" to which she answered "if mental health is untreated, it can impact the parent's ability to identify a child's needs or be able to meet them." However, she did not give an answer specific to Mr. J, only speaking to how mental health can impact "the parent's" abilities in general. She was later asked whether Mr. J is "presently capable of meeting [J.J.'s] emotional and physical needs," she responded he was not because "he continues to struggle with . . . managing his own mental health needs." However, Allen-Piilani never made a tangible connection between Mr. J's allegedly untreated mental health conditions and his ability to safely parent J.J., or otherwise reconciled this conclusion with her testimony regarding the role of Mr. J's mental health treatment by Dr. Brown.

The court found that J.J.'s removal from his home in February 2019 "coincided with Mr. [J's] commitment to a psychiatric hospital," and "while the underlying facts were not substantively proved, whatever happened required the response of police and emergency vehicles . . . and was of sufficient concern as to [J.J.'s] and Mr. [J's] well-being that the [c]ourt removed [J.J.] from his paternal grandmother's care." The court also discussed Mr. J's testimony at length, finding that his answers were evasive either as "an attempt at deception or simple ignorance," but, regardless, that it demonstrated he "has little insight into his own mental health issues and therefore no insight into how those affect his parenting." To be clear, the mere fact that a parent may be a difficult witness does not render them unfit to parent.

While the court made several findings that Mr. J lacked insight into his mental health conditions and that he had not made sufficient progress in improving his mental health, it did not make any specific findings about how that lack of insight or lack of sufficient improvement made Mr. J an unsafe parent or impacted his ability to care for J.J. For example, Finding 2.12.12 states:

> Mr. [J] has little insight into his own mental health issues and therefore no insight into how those affect his parenting, i.e., his parental deficits. Without insight and acknowledgement that his episodes that led to his psychiatric commitments impact him and therefore impact his ability to parent, and no evidence that Mr. [J's] mental health conditions have been sufficiently addressed, there is no reason to believe Mr. [J's] mental health is in any way improved to the point where it would be safe to place [J.J.] with him.

Finding 2.12.16 mirrors this, stating:

> But the [c]ourt has no information that Mr. [J] has addressed his mental health disorders in any way, let alone sufficiently to render him a parent who can provide a safe and stable home for [J.J.]. Mr. [J] clearly has an interest in parenting but has not demonstrated the capacity or capability to do so safely and effectively, especially considering [J.J.'s] special needs.

As a preliminary matter, both of these findings fail to recognize the evidence presented by the Department's own witnesses, that Mr. J was in fact engaged with addressing his mental health diagnosis with medication and management from Dr. Brown.[11] In fact, the portion of Finding 2.12.16 stating that "the [c]ourt has no information that Mr. [J] has addressed his mental health disorders in any way" is directly undercut by Allen-Piilani and is therefore unsupported by the record. (Emphasis added.) More critically, no finding by the court, and no testimony from any witness at trial, makes the requisite connection between the

---

[11] The court expressly found both DeCamp and Allen-Piilani to be "credible in all respects."

purported failure to address mental health concerns, which, as explained in section I above, was not borne out by the evidence, and an unfitness to safely parent. Notably, Mr. J's only ordered services related to mental health were to participate in a psychological evaluation with a parenting component, which then recommended medication management, both of which he satisfied.

A parent's "lack of insight into their condition may be considered" in analyzing unfitness. H.S., 94 Wn. App. at 528. However, the Department presents no authority to establish that either a lack of insight into a mental health condition, or a lack of satisfactory progress in treating that mental health condition, alone is sufficient to support a finding that a parent is presently unable to safely parent. While this court does "defer to the trial court's advantage in viewing the . . . witnesses," and reviews for substantial evidence, "[w]here the fact at issue must be shown by clear, cogent, and convincing evidence, substantial evidence must demonstrate that fact is 'highly probable.'" A.M.F., 23 Wn. App. 2d at 141 (internal quotation marks omitted) (quoting Sego, 82 Wn.2d at 739)).

The conclusory findings by the court, and similarly conclusory statements by the witnesses at trial, are insufficient to support a finding that Mr. J is currently unfit to parent.[12]

---

[12] Improper reliance on conclusions appears to have permeated these proceedings, through to the appellate stage. At oral argument, the Department offered, as evidence of the impact of Mr. J's mental health conditions on his ability to safely parent, documented struggles with attending all visitations with J.J. When asked if that was evidence of his mental health diagnoses, or socioeconomic circumstances as a food service worker, counsel for the Department responded "the mental health." Wash. Court of Appeals oral argument, In re Dependency of J.J., No. 84026-6-I (Jan. 11, 2023), at 16 min., 52 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023011181/?eventID=2023011181. When asked for evidence that linked the conduct regarding

-14-

B.      Inability to Safely Parent

The court also found Mr. J lacked the "capacity or ability to fully engage to learn how" to successfully parent, that, "Mr. [J] has not made sufficient efforts to have consistent visitation with [J.J.]," and that, "Mr. [J] . . . has not demonstrated the capacity or capability" to parent J.J. safely and effectively because he "engages with [J.J.] as a friend rather than a parent engaged in teaching, training, guidance, and structure."  However, the court again fails to tie these findings to an inability to safely parent.

To support termination of parental rights, the Department must do more than simply identify parenting deficiencies; it must also "prove that the parent's parenting deficiencies prevent the parent from providing the child with 'basic nurture, health, or safety' by clear, cogent, and convincing evidence."  A.B., 181 Wn. App. at 60, 61 (quoting RCW 13.34.020).  The court fails to do so and thus the termination is unsupported by substantial evidence.

"'[I]t is no slight thing to deprive a parent of the care, custody, and society of a child, or a child of the protection, guidance, and affection of the parent.'" T.L.G., 126 Wn. App. at 198 (alteration in original) (quoting State v. Rasch, 24

---

visits to mental health, the Department provided none, eventually asserting that this was a part of "a pattern of inability to follow through."  Wash. Court of Appeals oral argument, In re Dependency of J.J., No. 84026-6-I (Jan. 11, 2023), at 18 min., 01 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023011181/?eventID=2023011181.

After argument, the parties were directed to provide the record citations requested by the panel.  This line of questioning remains unanswered by the Department, thus, the panel concludes that no such evidence exists in the record.  The Department bears the burden of proof when undertaking the extreme step of terminating one's constitutional right to parent.  In re the Parental Rights to M.A.S.C., 197 Wn. 2d 685, 698, 486 P.3d 886 (2021) ("'the burden of proof in a termination trial is on the Department and should never be shifted to the parent.'" (quoting In re Welfare of D.E., 196 Wn.2d 92, 103, 469 P.3d 1163 (2020)).  Conclusions without evidence are insufficient in meeting this appropriately high burden of proof.

Wash. 332, 335, 64 P. 531 (1901)).  Because the Department has failed to meet its evidentiary burden, the termination of Mr. J's parental rights is contrary to the constitution.  We reverse and remand for the trial court to vacate the order of termination as to Mr. J.[13]

WE CONCUR:

---

[13] Because we reverse on these bases, we need not reach the remaining assignments of error.