

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re Dependency of: | ) | No. 38485-3-III |
| | ) | (consolidated with |
| E.J.G.,† | ) | No. 38486-1-III |
| A.L.G., | ) | No. 38487-0-III |
| E.S.G., | ) | No. 38488-8-III) |
| A.R.G. | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |
| | ) | |

LAWRENCE-BERREY, A.C.J. — S.G. appeals the termination of his parental rights

to his four children. He argues (1) services were not tailored to be reasonably

understandable in light of his intellectual impairment, (2) insufficient evidence was

presented that his parental relationship posed a barrier to the children's integration into

permanent homes, and (3) the termination statute is unconstitutional as applied to his

relationship with E.S.G. because less restrictive means than termination were available.

We disagree with his arguments and affirm.

---

† To protect the privacy interests of the minor children, we use their initials and
the initials of their father throughout this opinion. Gen. Order for Court of Appeals, *In re
Changes to Case Title* (Wash. Ct. App. Aug. 22, 2018) (effective September 1, 2018),
http://www.courts.wa.gov/appellate_trial_courts.

No. 38485-3-III (consolidated with 38486-1-III; 38487-0-III; 38488-8-III)
*In re Welfare of E.J.G.*


FACTS

S.G. is the father of four children: E.J.G., A.L.G., E.S.G., and A.R.G. In late 2018, the Department of Children, Youth, and Families (Department) became involved due to concerns of domestic violence, homelessness, substance abuse, and general lack of resources. When social worker Anna Lizarraga met S.G. to discuss these concerns, she learned that S.G. was a single father[1] caring for three[2] young children. The apartment had sparse furniture and very little food. Ms. Lizarraga offered S.G. a variety of resources and services, many of which he received and engaged in. They met several times to discuss child care, medical appointments, employment, and housing. Sometime during this period, law enforcement responded to S.G.'s apartment due to a physical altercation. After that incident, Ms. Lizarraga was unable to reach S.G.

On February 14, 2019, Ms. Lizarraga was called to the hospital where E.S.G. was being treated for a gash on his forehead. She learned that S.G. had been evicted from his apartment, so his family moved in with his brother. S.G.'s brother had thrown a baby bottle at E.S.G., causing the wound on his head. Ms. Lizarraga directed S.G. not to return

---

[1] The children's mother appears to have been absent from the beginning of this case. She relinquished her rights on the first day of trial and is therefore not a party to this appeal.

[2] At the time, S.G.'s fourth child, A.R.G., was residing with a maternal relative.

to his brother's home and found a shelter for the family that night. The next morning, S.G. left the shelter, returned to his brother's home, and missed his next meeting with Ms. Lizarraga.

On February 21, Ms. Lizarraga met S.G. at his brother's home. Throughout the meeting, S.G.'s brother became increasingly agitated at both Ms. Lizarraga and S.G. Ms. Lizarraga told S.G. to take the children out of the brother's home and scheduled a meeting for the next morning at her office. S.G. did not show up and repeatedly failed to follow through.

*Dependency proceedings*

On February 22, the Department filed a dependency petition as to S.G.'s four children. On July 2, all four children were found dependent.

After a shelter care hearing, the children were placed as follows: A.R.G. was to stay in her maternal grandmother's home where she had been living since the summer of 2018. A.L.G. and E.J.G. were placed together in licensed foster care. E.S.G. was placed in several homes throughout the dependency, including his maternal grandmother's home, licensed foster care, S.G.'s home for a short while, and ultimately a maternal relative's home.

No. 38485-3-III (consolidated with 38486-1-III; 38487-0-III; 38488-8-III)
*In re Welfare of E.J.G.*

Pursuant to the dependency order, S.G. was ordered to complete a chemical dependency assessment, random urinalyses (UAs), a neuropsychological evaluation, a parenting program, mental health treatment, a domestic violence assessment, and to keep in contact with the Department. We discuss the services in turn.

*Neuropsychological evaluation*

Shanna Porter, the Department social worker who replaced Ms. Lizarraga, first referred S.G. for a neuropsychological evaluation in the spring of 2019. S.G. missed his first two appointments. Ms. Porter reminded S.G. and spoke with him "extensively" to ensure he attended. Report of Proceedings (RP) at 154. She explained, "I do think it's important I was referring him for a neuropsychological evaluation due to concerns of [a] possible cognitive deficit, and so I was attempting to assist him with ensuring that he was getting to that appointment." RP at 154.

On December 1, Ms. Porter sent S.G. a third referral with a different provider. The referral informed the provider about the Department's concerns of domestic violence, S.G.'s "difficulties coping and with life management in general," and his "behavior and emotional state and his abilities to parent his kids." RP at 223. The Department also asked the provider to look into whether S.G. had a history of a traumatic brain injury.

4

No. 38485-3-III (consolidated with 38486-1-III; 38487-0-III; 38488-8-III)
*In re Welfare of E.J.G.*

On December 9, S.G. attended his initial intake with Dr. Jon Christensen. S.G. was very late to the appointment and had difficulty finding his identification. S.G. was agitated, cursed a lot, "snickered a few times" when filling out the forms, and made a nonsensical comment. RP at 226. On his intake form, S.G. reported a head injury from five years prior, but had little other information and no medical records. Regarding the initial intake, Dr. Christensen noted:

> [S.G.] had a hard time following directions and answering questions, so I think part of his difficulties is some people call him a liar and misleading, which is probably true, but he also seems to have a hard time understanding questions . . . . I had to ask him many times the same question over and over again for him to understand it, so it could be a combination of both.

RP at 228.

S.G. returned for testing in February 2020. Dr. Christensen found S.G. was "a much different person, a better demeanor, more calm, more focused, wasn't cussing, wasn't irritable." RP at 229. S.G. "admitted he was an alcoholic and he wanted to attempt to take more responsibility in his life." RP at 229. He told Dr. Christensen that he had been sober for 46 days, which he was proud of, and said he had a lot to learn.

Dr. Christensen administered extensive cognitive testing due to the Department's concern of S.G.'s ability "to follow through with things, understanding things, and so forth." RP at 230. Dr. Christensen employed "respected" and "well-normed" tests that

5

incorporated cognitive and psychological testing; personality inventories; attention, memory, and executive function testing; a full-scale intelligence quotient (IQ) test; and a problem solving/conceptualization skills test. RP at 230-36.

S.G.'s neuropsychological testing results are as follows: his IQ is in the 10th percentile, which "wasn't poor but it was low average." RP at 231-32. If he scored a few points lower, "he would be in the borderline intellectual functioning range." RP at 231. The IQ test suggested "some intellectual difficulties" regarding verbal skills, nonverbal skills, and processing speeds. RP at 232. Someone with S.G.'s IQ would find it more difficult to learn new techniques, including parenting skills, and tend to have trouble managing finances and solving problems with life events. Dr. Christensen noted that he "had to explain directions more often, more thoroughly" to S.G., and imagined he would "probably need more practice." RP at 233. Verbal instructions would not work well; instead, S.G. needs to hear the instructions and watch a demonstration. Dr. Christensen explained, "[I]t's not like he can't learn it, but he probably would take more time to learn." RP at 233.

S.G.'s working memory is in the lower limits of the average range. His immediate and delayed recall are in the 9th percentile, which is low but not "severe." RP at 240. His perceptional reasoning skills are in the low average range. He presented some

attention difficulties with a few "atypical scores" but he was not diagnosed with an attention disorder. RP at 235-36.

S.G.'s verbal comprehension test shows he has a "weak vocabulary," slow processing, and very slow response speeds. RP at 235-36. Some of S.G.'s executive functioning skills are adequate; Dr. Christensen explained that "he can articulate himself pretty well," and "he seemed to control his impulses." RP at 237. S.G.'s divided attention, cognitive flexibility, and transitioning skills ranged from the 1st to the 50th percentile. He struggled on conceptualization tests, including those that require finding similarities between things and bringing information together. S.G. had difficulty following the rules or directions to solve problems without getting off track. Dr. Christensen thought that repeated trials would help S.G. learn, versus just hearing something once.

Dr. Christensen diagnosed S.G. with moderate depressive disorder, antisocial personality disorder, and alcohol use disorder. He recommended S.G. continue individual therapy to work on his depression and emotional issues, and strongly consider medication. He opined that S.G. "needs to stay off alcohol for good for the rest of his life, and he can't be around drinkers or anybody who uses drugs." RP at 249-50. S.G. needed to

remain "fully accountable" to successfully address his parenting deficiencies and not

blame others.  RP at 250.

Dr. Christensen testified:

> [S.G. should o]bviously continue his services that he was in at that time, the domestic violence interventions and so forth, also continue parenting help.  *I thought in his case he needed a lot of practice at it, given the combination of his difficulties with learning in general, he needed more practice*, but also based on the fact that he just, unfortunately, didn't have very good role models growing up . . . so he needed a lot of practice with that, much more than probably a lot of people needed.

RP at 250 (emphasis added).

Dr. Christensen reiterated that "things take longer, a lot more repetition to learn

these skills, given the personality traits and the cognitive difficulties and the chronic

alcohol use."  RP at 250.  S.G. would benefit from hearing and seeing skills modeled by

an appropriate person.

Ms. Porter sent the neuropsychological report[3] to S.G.'s service providers and

discussed the findings therein.  She did not think the report provided "a very clear and

concrete recommendation for, say, hands-on learning, repeated exposure, or examples and

learning by seeing someone else doing it," but she nonetheless discussed the topics with

S.G.'s parenting educators.  RP at 259.  Dr. Christensen agreed his report did not

---

[3] The report is not in the record.

specifically recommend that S.G.'s providers model the behaviors to S.G. or give him examples.

Because the services take time and need to be repeated, Dr. Christensen suggested a reevaluation in one year to see where S.G. was in terms of progress.

*Chemical dependency evaluation, treatment, and testing*

In September 2019, S.G. completed his first chemical dependency evaluation with Melissa Wright. He acknowledged the need for professional intervention. Based on S.G.'s reported recent and continuing alcohol use and his inability to cease or control use, Ms. Wright recommended intensive inpatient treatment. Ms. Wright asked S.G. to engage in outpatient treatment immediately; he did not. Because S.G. did not report back, Ms. Wright could not inform him when a bed became available at the inpatient facility. Ms. Wright also referred S.G. to a mental health provider for an assessment.

In early January 2020, S.G. completed a second chemical dependency evaluation— this one recommended outpatient treatment. S.G. met with Matthew Daul, a substance abuse disorder counselor, weekly or biweekly for approximately 15 months. The goal of individual outpatient counseling was to help S.G. learn how to avoid relapse by changing his perspectives and monitoring his thoughts and emotions. Mr. Daul helped S.G. do this through cognitive behavioral training and developing a relapse plan. S.G.'s main

obstacles, which he acknowledged, were his one-sided view of things that affected his mood and led him to feel hopeless. Throughout individual substance abuse counseling, S.G. made gradual progress: "A lot of moving forward and then kind of moving backwards." RP at 367. Mr. Daul explained, "He would disappear . . . there was at least two times where he just disappeared and no one knew where he was for days, even weeks at a time." RP at 367. Although Mr. Daul acknowledged that S.G.'s disappearing did not necessarily mean he relapsed, his inconsistent attendance was one of the reasons he was in outpatient treatment for so long.

In March 2021, S.G. completed substance abuse services. Mr. Daul recommended he participate in support groups and continue with his other services thereafter. Mr. Daul thought S.G. had been learning based on their conversations, even though he may not have reached abstinence.

S.G. relapsed shortly after completing treatment. S.G. went through a third chemical dependency evaluation in May 2021, but did not engage in the recommended outpatient treatment thereafter.

During the dependency proceedings, S.G. intermittently submitted to court-ordered UAs. He submitted 10 samples showing no substance use. He failed to submit samples on 19 occasions, which is indicative of possible substance use. He provided 3 diluted

samples as well as 3 samples that were positive for alcohol. In March 2021, he provided a sample that tested positive for methamphetamine and alcohol.

*Domestic violence and anger management*

S.G. completed a domestic violence evaluation with Ginger Johnson in December 2019. Ms. Johnson recommended S.G. complete at least 12 months of domestic violence treatment focusing on the effects of abuse on children. S.G. did not engage in services with Ms. Johnson. The Department ultimately agreed to allow S.G. to complete an anger management course with Mr. Daul. In March 2021, S.G. completed a 16-lesson workbook called "Anger Management for Substance Abuse Disorder Mental Health Patients" under Mr. Daul's supervision. RP at 375. Mr. Daul did not recommend any follow-up to that course.

*Parenting classes, family therapy, and family preservation services*

In April 2019, Ms. Porter referred S.G. to an evidence-based parenting program. S.G. did not show up to his first two appointments, and he was discharged from that provider. Ms. Porter made numerous other referrals in the subsequent months until ultimately S.G. engaged in court-ordered family therapy.

S.G. began family therapy with Mary Anne Sacco in September 2019. Ms. Sacco noted that S.G.'s ability to meet his goals improved with his sobriety but waned as he

11

relapsed. She felt he had trouble measuring his needs against his children's and being reasonable after relapsing. When S.G. was present and engaged, he could join his children effectively. He was able to form a better relationship with E.S.G. this way. Although S.G. is a hard worker, has a strong desire to be employed, and loves his children, "he has his own issues" that he has to solve "before he can take care of anybody else." RP at 93. Ms. Sacco felt that therapy could not repair the parent-child bond in the near future and the children could not safely return to S.G.'s care in the near future.

Ms. Sacco identified S.G.'s biggest weakness as his inability to recognize and meet his children's needs. He is "very strong willed and wants to do things his way" and resists learning about the children's individual needs. RP at 93. Ms. Sacco did not think S.G. could parent all four children independently because he had trouble parenting E.S.G., was not transparent about asking for help, and lacked a strong support system.

In September 2020, S.G. began working with Tyson Rice, an intensive family preservation therapist. The purpose of this service was to stabilize S.G. for reunification with E.S.G. Their goals for S.G. were: (1) to "implement positive parenting strategies," (2) to engage with services and learn to manage E.S.G.'s behavior and mental health, and (3) to access resources and use organizational skills to meet his family's basic needs. RP at 325.

12

Mr. Rice teaches positive parenting strategies through role playing, watching videos, reading, and practice cueing. S.G. adapted the skills Mr. Rice taught him well; when S.G. informed Mr. Rice he had difficulty retaining information, they created visual charts of expected behaviors and the processes necessary in using those behaviors. S.G. put the charts around his home to remind him what to do in the moment. At trial, the following exchange took place:

> [THE DEPARTMENT:] In working with [S.G.], aside from kind of the visual learning, what did you do to make sure that he was fully understanding and comprehending the material you were teaching him?
> [MR. RICE:] We use a variety of different types of media. . . . [W]e did videos of them that had a vignette, and then I had a PDF [portable document format] of notes on that to help him remember how to use it. That was one of the things we also used in a chart.
> And then a lot of cueing, so like if [S.G.] was getting frustrated, he was really good about letting me know, "I don't know what to do here," and which also tapered off as . . . he got more practice with it . . . . I'm there to cue a lot of that stuff early on, and we like to see them transition to doing it independently before we close, which he was able to do.

RP at 328-29.

At the end of the 30-day program, Mr. Rice recommended that S.G. engage in a full positive parenting program, parent-child therapy, individual and family counseling, substance abuse treatment, and anger management classes. S.G. was opposed to continuing services after completing intensive family preservation, stating he did not need hands-on parenting help.

13

Another family preservation therapist, Elezaveta Mikheyeva, worked with S.G. starting in December 2020. Although this referral was to "assist him in managing equipment, child care needs, and develop strategies to manage the children's behaviors," Ms. Mikheyeva and S.G. developed other goals including following through with his substance abuse and mental health counseling services. RP at 349-50. Each week, Ms. Mikheyeva would "see if he had his appointment time set up with his mental health therapist or check in around group and report back to the social worker around dates and times." RP at 355. S.G.'s attendance was inconsistent, but he was reflective about his parenting skills and began making progress in the spring of 2021 before he stopped showing up. At that point, "He was discharged due to lack of engagement." RP at 356.

S.G. did not participate in further parenting classes or programs and he stopped coming to family therapy in June 2021. There were initially some issues with transportation and then S.G. began struggling with sobriety and stopped communicating. S.G. contacted Ms. Sacco one week before trial, expressing some regrets for failing to continue family therapy.

*Mental health treatment*

From October 2019 to May 2021, S.G. participated in individual therapy with William Frye. They met weekly for a few months, then scaled back to biweekly until

14

S.G. struggled and required more frequency. The goals of this therapy were to help S.G. gain insight and recognize safety concerns for his children, teach him to problem solve and gain life management skills, and increase his ability to consistently meet his children's needs. S.G. made progress but got frustrated with the system, feeling like things were "stacked against him." RP at 281. Mr. Frye encouraged S.G. to keep participating in services so he could successfully learn coping skills. S.G. did not show up, without notice, to at least nine sessions, but Mr. Frye chose not to note them all so S.G. could continue services.

When S.G. relapsed in spring 2021, he was "devastated" that E.S.G. would be removed from his care. RP at 286. However, he "appeared to bounce back from that pretty quickly" and was optimistic he could work toward sobriety despite his anxiety and depression. RP at 286. S.G. and Mr. Frye decided to meet weekly again, but S.G. did not show up. Mr. Frye tried e-mailing, calling, and contacting S.G. through the social worker but was unable to reach him. Mr. Frye ultimately discharged S.G. for too many no-shows and lack of communication.

*Neuropsychological follow-up*

In February 2021, Ms. Porter followed up with Dr. Christensen to tell him that S.G. had relapsed and stopped engaging in some services. Given those circumstances,

15

Dr. Christensen recommended against the reevaluation he had initially suggested.  He

noted that although "a lot of things ha[d] been offered" to S.G., i.e., services,

interventions, and help, "the prognosis wasn't good."  RP at 253.  Dr. Christensen felt

that S.G. would probably not make any more progress given his lack of improvements in

the prior year.

*Termination proceedings*

On February 19, 2020, the Department filed for termination of S.G.'s parent-child

relationship with his four children.  One month before trial was set to begin, S.G. sought a

continuance so he could engage in services to address and remediate the parental

deficiencies identified by the Department.  The Department opposed the continuance,

noting that S.G.'s unstated reason for pushing back trial was so he could take a months-

long commercial fishing job in Alaska.  The court denied the continuance and the case

proceeded to a three-day trial.

The State called 15 witnesses including 2 social workers, the guardian ad litem

(GAL), several therapists, counselors, and parenting program providers.  The service

providers and social workers testified as described above.  S.G. did not appear.

At the close of testimony, the court acknowledged the gravity of the case and took

the matter under advisement.  Two days later, it delivered its oral ruling.  The court stated

that S.G. has very significant challenges to address including numerous psychological

disorders such as "depression, post-traumatic stress disorder, anxiety, perhaps antisocial

personality disorders, and . . . disorder otherwise nonspecified, which is what

psychological professionals often say when they're not able to completely pin down what

the diagnosis is, but they know there is something there." RP at 476-77.

The court began by asking whether S.G. could take care of himself, provide

for his own basic needs, food, shelter, and income and found that he "has demonstrated

that he cannot consistently do any of these things." RP at 479. The court proceeded to

address the termination factors in RCW 13.34.180. Relevant here, with regard to

RCW 13.34.180(1)(d), the court found:

> [T]he department must show that services offered have been *expressly and understandably offered* . . . . And indeed, that's what we spent this entire trial talking about, hearing from countless providers who attempted or, in fact, some in some instances did provide limited services to [S.G.]. This portion of the statute has clearly been demonstrated to the Court.

RP at 480 (emphasis added).

Regarding whether the Department's obligation to provide services at this point is

futile, the court found:

> I'm satisfied that [S.G.] simply will not engage or engages for a bit and then sketchily disappears completely or never engages at all. Further attempts to provide services to [S.G.] are clearly futile.

17

No. 38485-3-III (consolidated with 38486-1-III; 38487-0-III; 38488-8-III)
*In re Welfare of E.J.G.*

> The department has shown that there is little likelihood of change in the near future and, again, I come back to the fact that it's been two and a half years and there is quite literally it appears no charge [sic] for the better, in terms of [S.G.] and his ability to parent and do so going forward.
>
> For the record, I will point out again that instead of coming in here to this trial and helping his counsel and helping the Court to understand how things might be better and what he might do, [S.G.] is a no-show and he leaves for Alaska. Your children are the most important thing, bar none, yet [S.G.] is not here.

RP at 482-83. The court found that the children are finally in stable placements and that continuing the parent-child relationship clearly diminishes their prospects for early integration into those homes. Therefore, the court concluded that termination is clearly in the best interests of the children.

The court entered written findings of fact and conclusions of law and termination orders on September 17, 2021.

S.G. timely appeals.

## ANALYSIS

### A. TAILORED SERVICES

S.G. contends the Department failed to tailor necessary services to his cognitive limitations and this warrants reversal of the termination orders. For the reasons set forth below, we disagree.

18

"Parents have a fundamental liberty interest in the care, custody, and management of their children." *In re Welfare of D.E.*, 196 Wn.2d 92, 102, 469 P.3d 1163 (2020) (citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (plurality opinion)). Children also have an interest in the natural relationship with their parents. *Id.* at 103. Given the vital interests at stake, the Department bears the burden of proof at termination trials. *In re Parental Rights to M.A.S.C.*, 197 Wn.2d 685, 698, 486 P.3d 886 (2021).

"The legislature has prescribed a statutory scheme that balances the parents' liberty interest with the child's right to a safe and healthy environment." *In re Dependency of K.D.S.*, 176 Wn.2d 644, 652, 294 P.3d 695 (2013). Before terminating parental rights, the Department must establish six statutory elements by clear, cogent, and convincing evidence. *In re Parental Rights to D.H.*, 195 Wn.2d 710, 718, 464 P.3d 215 (2020) (citing RCW 13.34.180(1)).

S.G. challenges the trial court's finding on RCW 13.34.180(1)(d),[4] which requires that all reasonably available necessary services capable of correcting the parental deficiencies, as well as all court-ordered services, are "expressly and understandably offered or provided." *Id.* A "necessary service" is one that "'address[es] a condition that

---

[4] RCW 13.34.180 was amended by SUBSTITUTE H.B. 1747, 67th Leg., Reg. Sess.

19

precludes reunification of the parent and child,'" often including mental health treatment, counseling, and educational programming. *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 480, 379 P.3d 75 (2016) (quoting *In re Dependency of A.M.M.*, 182 Wn. App. 776, 793, 332 P.3d 500 (2014)).

Here, S.G.'s parenting deficiencies were his mental health issues, lack of parenting skills, chemical dependency, and domestic violence history. The trial court found that all services offered to S.G. were expressly and understandably provided and that all necessary services capable of correcting his parenting deficiencies in the foreseeable future were offered. The services included a domestic violence assessment and treatment, chemical dependency evaluations and treatment, a neuropsychological evaluation, mental health treatment, and evidence-based parenting programs as well as all corresponding recommendations. S.G. does not meaningfully dispute that those services were offered; he instead argues they were not understandably offered in light of his cognitive deficits.

### *Reasonably tailored services*

The Department must tailor its offered services to the individual, requiring it to identify a parent's specific needs and provide services accordingly. *In re Parental Rights to I.M.-M.*, 196 Wn. App. 914, 921, 385 P.3d 268 (2016). For example, when a parent

---

(Wash. 2022) (effective June 9, 2022). The amendment does not impact subsection (d).

has both mental health and chemical dependency needs, the Department must provide integrated services. *Id.* at 922. This statutory requirement must be understood in light of the constitutional principles outlined above. *M.A.S.C.*, 197 Wn.2d at 698.

Our Supreme Court recently clarified the law in this area. *See M.A.S.C.*, 197 Wn.2d 685. In *M.A.S.C.*, the Department became involved due to suspected abuse or neglect by the child's mother, J.C. *Id.* at 689-90. The Department developed concerns about J.C.'s "'lack of cognitive skills'" and "'impaired faculties,'" both of which were heightened by her child's specialized medical needs. *Id.* at 690. Months later, the child was removed from J.C.'s care and placed in protective custody. *Id.* An agreed order of dependency was entered, requiring J.C. to complete a 22-item list of services. *Id.* at 692-93. J.C. struggled with some of these requirements and the Department ultimately petitioned for termination of her parental rights. *Id.* at 695-96. The petition contained the same 22-item list, asserting "that every item on the list was a 'service' that had 'been expressly and understandably offered or provided.'" *Id.* at 696. Following a bench trial, the court found the Department proved that services had been expressly and understandably provided and that termination was in the child's best interests. *Id.* at 696-97. J.C. appealed. *Id.* at 697.

The Court of Appeals affirmed, reasoning there was no indication J.C. had communication difficulties preventing her from understanding what was expected. *Id.* Our Supreme Court accepted discretionary review to "add clarity and substance to the requirement that [the Department] must tailor its offers of services to accommodate the needs of parents with intellectual disabilities." *Id.* at 699. The court described the steps in the process as follows.

### M.A.S.C.*'s analytical framework*

First, where the Department "has reason to believe that a parent may have an intellectual disability, it must make reasonable efforts to ascertain the extent of the disability and how it could interfere with the parent's ability to understand and benefit from [the Department]'s offer of services." *Id.* This threshold requirement ensures that the Department "'cannot escape its obligation to provide coordinated services by inexplicably failing to investigate the likelihood a parent is developmentally disabled.'" *Id.* (quoting *I.M.-M.*, 196 Wn. App. at 924).

Second, if the parent does have an intellectual disability, the Department must tailor its offer of services to ensure that it is reasonably understandable. *Id.* "This tailoring must be informed by current professional guidelines and must accommodate the individual parent's needs rather than relying on broad-based or untested assumptions

22

about the needs and abilities of people with intellectual disabilities." *Id.* (citing *In re*

*Dependency of H.W.*, 92 Wn. App. 420, 429, 961 P.2d 963 (1998)).

Third, if the case proceeds to termination, the trial court must apply a consistent

standard when evaluating whether the Department understandably offered services based

on the totality of the circumstances. *Id.* at 699-700. The court must put itself in the place

of "an objective observer who is aware of the nature and extent of the parent's intellectual

disability, as well as current professional guidelines for communicating with people who

have similar disabilities." *Id.* at 700.

The *M.A.S.C.* court held that the Department had reason to believe J.C. might have

cognitive difficulties yet never obtained a clinical diagnosis to ascertain the extent of her

potential disability. *Id.* at 701. Although the social worker was trained to work with

developmentally disabled clients, she did not diagnose or attempt to otherwise ascertain

J.C.'s cognitive impairment, and J.C. never underwent an appropriate evaluation because

J.C. did not follow through. *Id.* at 700-01. The court held it was unclear if J.C.

understood how important such an evaluation may have been and she likely did not have

a method to identify and prioritize the 22-item list of offered services. *Id.* at 701-02.

The court also rejected the argument that J.C. understood the services based on the

social worker's belief that J.C.'s failure to complete services was due to a lack of effort,

not for lack of understanding. *Id.* at 703-04. The social worker spoke with J.C. often and repeated herself frequently and J.C. asked questions and provided reasonable answers. *Id.* at 704. This testimony, the court held, was not proof that the Department's offer of services was reasonably understandable. *Id.* Instead, "[i]t proves only that if J.C. does have an intellectual disability, it is not obvious or profound." *Id.* Some individuals who require accommodation learn to mask their disabilities. *Id.* at 705. Thus, a subjective belief that a parent understands is not enough to meet the Department's burden and does not fit into the objective analysis. *Id.* at 704.

The *M.A.S.C.* court held that the Department failed to prove by clear, cogent, and convincing evidence that it made reasonable efforts to expressly and understandably offer all necessary and court-ordered services to J.C., and reversed the termination order. *Id.* at 705.

### *Application*

"Our role in reviewing a trial court's decision to terminate parental rights is limited to assessing whether substantial evidence supports the trial court's findings." *D.H.*, 195 Wn.2d at 718. We do not disturb a trial court's findings "unless there is an absence of clear, cogent, and convincing evidence in the record" supporting them. *Id.*

24

Having set forth the relevant framework and standard of review, we proceed to analyze the facts of this case.

First, the Department had reason to believe that S.G. had a cognitive deficit or traumatic brain injury and referred him for a neuropsychological evaluation shortly after filing the dependency petition. S.G. missed several appointments but the social worker continued reaching out and found a new provider to accommodate the missed intakes. S.G. ultimately underwent a comprehensive neuropsychological evaluation. The Department did not fail to investigate S.G.'s potential disability; it made reasonable efforts to ascertain the extent of his limitations and indeed obtained a detailed report from Dr. Christensen. Accordingly, the Department met the first *M.A.S.C.* requirement.

Second, we examine whether S.G. has an intellectual disability such that the Department must tailor its offer of services. *M.A.S.C.*, 197 Wn.2d at 699. The parties disagree about whether S.G. has an intellectual disability and, if so, whether the Department appropriately tailored the services such that they were reasonably understandable to meet S.G.'s individual needs. We discuss these issues in turn.

*Intellectual disability*

The Department argues the record does not support a finding that S.G. is developmentally disabled such that *M.A.S.C.* applies. This argument misses the mark.

First, like S.G., the parent in *M.A.S.C.* was never diagnosed with an intellectual disability.[5] Yet the Department's duty to investigate and tailor services accordingly remained. *M.A.S.C.*, 197 Wn.2d at 689; *see also I.M.-M.*, 196 Wn. App. at 922 ("Regardless of whether [the mother] was actually developmentally disabled, the Department failed to provide available and appropriate services."). Second, the Department's duty to tailor services is not dependent on a certain severity of cognitive impairment. Rather, the duty arises as soon as the Department *has reason to believe* the parent has an intellectual disability. *M.A.S.C.*, 197 Wn.2d at 689; *see also I.M.-M.*, 196 Wn. App. at 922 (explaining that the Department's knowledge of mother's cognitive impairment triggered its duty to provide tailored services).

Here, there is no dispute that S.G. has some cognitive limitations. Indeed, the parties agree he has difficulty paying attention, learning new skills, and conceptualizing

---

[5] If a parent is formally diagnosed as developmentally disabled, the Department is statutorily obligated to refer them for services through the developmental disabilities administration and coordinate a care plan. *I.M.-M.*, 196 Wn. App. at 924 (citing RCW 13.34.136(2)(b)(i)(B)). This ensures the provision of tailored services. *Id.*

tasks, has lower intellectual functioning, and has verbal, attention, and processing

deficits. Although the dependency petition does not mention any cognitive impairments,

the Department knew S.G. had some limitations. Accordingly, it was required to tailor

services according to his individual needs to ensure its offer of services was reasonably

understandable. *M.A.S.C.*, 197 Wn.2d at 699; *I.M.-M.*, 196 Wn. App. at 921-22.

### *Tailored services*

We proceed to examine whether S.G.'s services were properly tailored. We

addressed the tailoring of services in the context of cognitively impaired parents in

*I.M.-M*. There, the mother had "low cognitive functioning" with an IQ of 79, she was

developmentally disabled or delayed and suffered from a substance abuse disorder. 196

Wn. App. at 917-18. A psychological evaluation indicated she was "significantly

cognitively impaired" such that completing services would be difficult; she learned new

information slowly, required repetition, and would have trouble in the substance abuse

group treatment setting. *Id.* at 918. The evaluator never made a final diagnosis because

he failed to complete the applicable testing. *Id.* at 919. After a trial, the court terminated

the mother's rights, rejecting the argument that she should have been provided

developmental disability services for insufficient evidence of her disability. *Id.* at 920.

The court found the mother's providers were aware of her limitations and provided

27

accommodations and, even if they had not, her deficiencies would not have been remedied in the foreseeable future. *Id.* The mother appealed. *Id.*

This court reversed and remanded. We noted the psychological evaluator's report was not shared with most of the providers. *Id.* at 919. A few providers noticed the mother was unable to retain information and attempted to accommodate, despite not being trained to do so. *Id.* at 920. The failure to tailor services was especially problematic with the mother's chemical dependency provider, who testified that she was unaware of any cognitive difficulties and therefore could not help the mother retain skills in that critical area. *Id.* at 922.

We distinguish *I.M.-M.* Here, Ms. Porter was concerned with S.G.'s cognition, ensured S.G. obtained a neuropsychological evaluation, and told Dr. Christensen to look for a potential traumatic head injury. She expressed concern with S.G.'s ability to understand things, which prompted Dr. Christensen to administer numerous cognitive tests. Dr. Christensen's report is not in our record, but we presume it reflects his testimony. Dr. Christensen did not diagnose S.G. with a developmental disability such that the Department was required work with the developmental disability administration to coordinate a care plan, but he indicated that S.G. benefits from extra time and repetition.

28

Ms. Porter shared and discussed the report with all of S.G.'s providers, although Mr. Daul never affirmatively received it. The record shows that most of S.G.'s difficulties in services were related to his inconsistent attendance, not with his ability to "learn new techniques." RP at 232-33. Dr. Christensen never stated that S.G.'s intellectual functioning would prevent him from understanding the importance of attendance and participation. Dr. Christensen opined that S.G. was able to express himself well, which likely contributed to his progress in substance abuse counseling. When S.G. attended sessions with Mr. Daul, he made gradual progress until he disappeared for days or weeks. There is no indication S.G.'s substance abuse counseling was inaccessible due to his cognitive abilities. And there is no evidence supporting S.G.'s implication on appeal that he relapsed because his chemical dependency services were not tailored. Rather, S.G.'s attendance was his biggest obstacle.

It appears that S.G.'s other providers recognized his cognitive limitations either because they received the report from Dr. Christensen or because S.G. told them he had trouble retaining information. For example, Mr. Rice adapted the program after S.G. informed him of this: together they created visuals, role played, and watched videos to practice new skills. Mr. Rice saw S.G. improve with practice and alternative learning methods. This service was tailored to S.G.'s needs, and he successfully completed it.

Ms. Mikheyeva worked with S.G. a few months later, checking in with him frequently to ensure he did not miss his service appointments. Unfortunately, despite some progress with Ms. Mikheyeva, S.G. ultimately stopped showing up, and he was discharged for lack of engagement. Further parenting skills and education services were offered numerous times throughout the dependency proceedings; S.G. affirmatively declined to participate.

In sum, the trial court's finding that the Department's offer of services was reasonably understandable to S.G. is supported by clear, cogent, and convincing evidence. Unlike in *I.M.-M.*, where the mother was developmentally disabled or delayed yet the Department failed to obtain a comprehensive evaluation, here the Department referred S.G. to neuropsychological testing where he was diagnosed with mental health disorders rather than developmental disabilities. Dr. Christensen specifically evaluated for cognitive impairments; Dr. Christensen's report showed varying difficulties but he opined that S.G. could learn with time. There is no indication that S.G. had trouble understanding the importance of substance abuse counseling, individual therapy, or maintaining his sobriety such that his children could be returned. Indeed, the record shows he was very aware of the impact of his alcohol use and acknowledged to multiple providers the importance of his sobriety. When he attended treatment, he made progress. But he was discharged from most of his services due to inconsistent attendance

30

throughout the two and one-half years of these proceedings. This was not the fault of the Department, and it is unclear how any more tailoring would have changed this result.

### *Trial court's role at termination*

The final step in the *M.A.S.C.* framework applies only when "efforts to reunify the family are unsuccessful" and the case proceeds to a termination trial. 197 Wn.2d at 699. "[T]he trial court's role in evaluating whether [the Department] has understandably offered services to the parent is to apply a consistent, objective standard that accounts for the individual circumstances of each case." *Id.* at 699-700. This requires the court to become an objective observer, "aware of the nature and extent of the parent's intellectual disability, as well as current professional guidelines for communicating with people who have similar disabilities." *Id.* at 700. The court must then determine if the Department's offer of services was reasonably understandable given the totality of the circumstances. *Id.*

S.G. first argues the Department failed to offer evidence of the current professional guidelines for providing services to persons with disabilities and this prevented the trial court from reliably determining what would have been appropriate for someone with S.G.'s level of functioning. We disagree.

31

Dr. Christensen is a licensed clinical psychologist with extensive experience. The trial court admitted Dr. Christensen as an expert witness; S.G. did not object. Dr. Christensen testified at length about S.G.'s cognitive limitations and the types of accommodations he needed—mainly repetition, demonstration, and more time. The trial court was well aware of what would be appropriate for someone with S.G.'s functioning and surely considered that information before ruling on termination.

S.G. next argues the trial court failed to evaluate the Department's efforts in light of S.G.'s intellectual impairment. We disagree. Again, the trial court was apprised of the nature and extent of S.G.'s limitations. It considered and discussed every service offered and found that S.G. failed to remedy the numerous concerns raised by the Department despite having two and one-half years to do so. The court noted that the majority of the trial focused on the providers' attempts to engage with S.G., who would either not show up or would engage for a short time before disappearing. While the court did not specifically mention S.G.'s cognitive impairments when ruling on whether the Department met its burden, under the totality of the circumstances, the finding that the Department made reasonable efforts to offer and provide services that were reasonably understandable to S.G. is supported by ample evidence in the record. Although it would have been helpful for the trial court to explicitly acknowledge S.G.'s cognitive difficulties

somewhere in its findings, it certainly considered them given the amount of testimony dedicated to that topic.

We conclude that the trial court's finding that the Department's offer of services was reasonably understandable to S.G. is supported by clear, cogent, and convincing evidence.

B.    CONTINUED RELATIONSHIP

S.G. contends the trial court erred in finding that continuation of the parent-child relationship diminished his children's prospects for early integration into stable and permanent homes. We disagree.

As discussed above, the Department must prove six elements by clear, cogent, and convincing evidence before a court will order termination of parental rights. *See* RCW 13.34.180(1). S.G. argues there was insufficient evidence supporting the trial court's finding on the final element, which requires proof "[t]hat continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." RCW 13.34.180(1)(f). This element "'is mainly concerned with the continued effect of the *legal* relationship between parent and child, as an obstacle to adoption.'" *In re Dependency of A.D.*, 193 Wn. App. 445, 458, 376 P.3d

33

No. 38485-3-III (consolidated with 38486-1-III; 38487-0-III; 38488-8-III)
*In re Welfare of E.J.G.*

1140 (2016) (quoting *In re Dependency of A.C.*, 123 Wn. App. 244, 250, 98 P.3d 89

(2004)).

The Department may establish this element in one of two ways. First, it can show

that "a permanent home exist[s] but the parent-child relationship prevents the child from

obtaining that placement." *In re Welfare of R.H.*, 176 Wn. App. 419, 428, 309 P.3d 620

(2013). The inquiry is whether the relationship impedes the child's prospects for

integration, not what constitutes a stable and permanent home. *K.D.S.*, 176 Wn.2d at 658.

Alternatively, the Department can show that the parent-child relationship has a damaging

and destabilizing effect on the child that could negatively impact the child's integration

into a permanent placement. *R.H.*, 176 Wn. App. at 428 (citing *K.D.S.*, 176 Wn.2d at

659). For example, evidence that the continuation of the parent-child relationship creates

feelings of insecurity and instability in the child may satisfy RCW 13.34.180(1)(f).

*K.D.S.*, 176 Wn.2d at 658.

The parties seem to disagree about whether the above methods of proving

RCW 13.34.180(1)(f) are alternatives. The case law is clear: they are. *See A.D.*, 193 Wn.

App. at 459 ("*K.D.S.* provides *one* way that the State can prove RCW 13.34.180(1)(f), *not*

*the only way*.") (emphasis added). Thus, contrary to S.G.'s assertion, the Department was

not required to prove that S.G.'s continuing relationship with his children diminishes the

34

likelihood that they will be emotionally and psychologically prepared to integrate into

their stable homes.  The Department brought evidence of the alternative method:

permanent homes exist but S.G.'s legal relationship with the children prevents them

obtaining those placements.

> The trial court found:

### VIII.

> The court ordered approved permanent plan for these children is adoption.
> [A.R.G.] resides with her maternal grandmother who she identifies as her
> primary caregiver.  Her grandmother is a permanent placement.  [E.S.G.]
> resides with a maternal family member who is also a permanent placement.
>  Since he has been living with his relatives, his behaviors have decreased
> and he developed a close bond with both adult caregivers in the home.
> These relatives are an adoptive home. [A.L.G.] and [E.J.G.] reside in
> licensed foster care.  They have been in the same home since being
> removed in February 2019.  They both identify their foster parents as their
> mom and dad and understand their foster home as their home.  This is an
> adoptive home.  Parental rights need to be terminated so that they can be
> adopted into the families of their respective placement.

Clerk's Papers (CP) at 836.

No. 38485-3-III (consolidated with 38486-1-III; 38487-0-III; 38488-8-III)
*In re Welfare of E.J.G.*

Clear, cogent, and convincing evidence supports the finding that S.G.'s parental rights needed to be terminated so his children could be adopted by their placements.[6] The GAL, Debra Shumway, testified at length about the children's placements. A.R.G. has lived with her grandmother throughout the case, views that home as "her safe place" and wants to be adopted by her grandmother. RP at 66. E.S.G. moved six to eight times throughout the proceedings and had just achieved some form of stability. E.S.G. was ultimately placed with a maternal relative who met his needs better than any of the prior placements, and the GAL believes it is in his best interest to be adopted by this placement. A.L.G. and E.J.G. are placed together in foster care; they call their foster parents "Mom and Dad" and refer to the other child in the home as their "brother." RP at 74. Both children are doing well, are bonded with the family, and the GAL believes it is in their best interests to seek adoption with this placement.

S.G. argues that his continuing relationship with the children could not diminish their integration into a stable and permanent home because they are already integrated

---

[6] To the extent S.G. reads finding of fact VIII as relating to the alternative means under RCW 13.34.180(1)(f), that the parent-child relationship has damaging and destabilizing effects or otherwise prevents the children from emotionally or psychologically integrating into their permanent homes, we disagree. The finding discusses the children's stable placements and the need for termination so they can be adopted; there is no mention of any negative emotional or psychological aspects of the parent-child relationship.

36

into those homes. In *A.D.*, Division One of this court rejected a mother's identical argument, noting that it erroneously focused on only the stability of placement, not its permanence. 193 Wn. App. at 458. Although a foster home may be safe and stable, it is by definition temporary. *Id.* We held that, although the mother was correct that the parent-child relationships were not destructive, that was irrelevant. *Id.* at 459. The other way to prove RCW 13.34.180(1)(f) was met: the mother's legal relationship with the children prevented them from being adopted into permanent homes. *Id.* The same analysis applies here: S.G.'s legal relationship with the children prevents their adoption. It is irrelevant that they are already integrated into the future adoptive homes.

We conclude that the trial court's finding that continuation of S.G.'s parent-child relationship diminishes the prospects of his children's early integration into stable and permanent homes is supported by clear, cogent, and convincing evidence.

C. CONSTITUTIONAL CHALLENGE

S.G. contends the termination statute is unconstitutional as applied to his relationship with E.S.G. He argues E.S.G. was attached to him and it would be in E.S.G.'s best interest to continue having contact, but the trial court was forced to choose between termination or an eventual return home. We disagree.

37

Before analyzing S.G.'s constitutional challenge, we lay out the facts relevant to his relationship with E.S.G.

In September 2020, E.S.G. was returned to S.G.'s care. Initially, the GAL believed that E.S.G. would succeed there because "he was attached," so they worked to maintain that placement for his benefit. RP at 73. Still, "[t]heir relationship was a little volatile." RP at 73. E.S.G. would throw fits and talk disrespectfully, S.G. would ignore those behaviors, and "[t]hey struggled to have a solid relationship." RP at 73. E.S.G. did not feel safe. When E.S.G. was placed elsewhere and came back from visits with S.G., he threw himself on the ground, and would kick, scream, and curse. These behaviors did not change when he lived with S.G.

Family therapist Ms. Sacco noted that E.S.G. was "kind of better" when he was placed with S.G. and S.G. was sober. RP at 97. During that period, E.S.G. was compliant, expressive, and "he absolutely loved that time with his dad." RP at 97. E.S.G. was happier with S.G. than he had been with his grandmother. But when S.G. became employed and then relapsed, there was "more tension and more conflict." RP at 98.

During play therapy, E.S.G. appeared to be processing the loss of S.G., his negative feelings toward S.G., and the physical violence he experienced while in S.G.'s care. E.S.G. demonstrated his father's aggressive behavior in the home, yelling bad

words, and stated that S.G. was "a bad dad" who the police might come and "kill." RP at 172. The therapist thought E.S.G. "felt very unsafe and unwanted, not belonging, a great deal of rage on top of his horrid sadness and grief about not being wanted." RP at 183. E.S.G. showed anger toward his mother, which the therapist believed was his way of "joining his dad" in "aggressing against his mom." RP at 184. She believed E.S.G.'s exposure to violence taught him that when boys hit girls, they have power over them. Another therapist worked on E.S.G.'s trauma while he was living with S.G., and found E.S.G. witnessed a lot of yelling and aggression. E.S.G. said "he had nobody to talk to at home." RP at 390.

E.S.G. was removed from S.G.'s care in April 2021 after S.G. tested positive for methamphetamine. The court was also concerned with E.S.G.'s poor school attendance and missed appointments.

Since E.S.G. moved to his current placement, he progressed well, learned to identify his emotions, and would likely graduate from counseling. The GAL stated that after leaving S.G., E.S.G. did "a complete 180" and "is doing phenomenal." RP at 70. Ms. Sacco agreed, explaining that after E.S.G. settled into his new placement, "[he] look[ed] so happy. He looked like a completely different person. I don't think I realized how much tension he held in his body, but he . . . just looked amazingly different and his

ability to adapt and cope seem much, much better." RP at 99. The GAL believed distance from S.G. has helped E.S.G. stabilize and "[h]e's ready to move on." RP at 71.

E.S.G. felt uncomfortable when S.G. talked to him about returning home. E.S.G. told his therapists that "he did not want to go back and live with Dad," and was worried he would have to return to S.G. RP at 392. E.S.G. had not seen his father since July 7, 2021, and "refused to see him since that visit." RP at 72. The GAL believes E.S.G. "feels like he knows where he needs to be and he's fine and he has not had any interest to pursu[e] a relationship with his father since that point." RP at 72. However, when asked how E.S.G. would be affected if he no longer had the ability to communicate with S.G., Ms. Sacco responded, "it would be in [E.S.G.]'s interest to have some kind of contact with [S.G.] in the future; that's for sure." RP at 119.

Based on this testimony, the trial court found that E.S.G. substantially improved after being removed from S.G.'s care. The court concluded it was in the children's best interests to terminate the parent-child relationship: they "have been in Department custody for two-and-a-half years while they were waiting for [S.G.] to remedy his parental deficiencies," and their "attachment to their father has waned and they do not view him as a safe stable parent." CP at 836. E.S.G. declined to visit with his father recently, and he has "a right to a safe, permanent and stable home." CP at 837.

40

*Analysis*

We review constitutional challenges de novo. *In re Welfare of A.W.*, 182 Wn.2d 689, 701, 344 P.3d 1186 (2015). We presume statutes are constitutional, and the party challenging the statute bears the burden of proving beyond a reasonable doubt that the statute is unconstitutional. *Id.*

An "as-applied" challenge to a statute's constitutionality requires examination of the statute in the specific circumstances of the case. *See Fields v. Dep't of Early Learning*, 193 Wn.2d 36, 46, 434 P.3d 999 (2019); *see also City of Redmond v. Moore*, 151 Wn.2d 664, 668-69, 91 P.3d 875 (2004) (As-applied challenges are "characterized by a party's allegation that application of the statute in the specific context of the party's actions or intended actions is unconstitutional."). Holding a statute unconstitutional as-applied does not totally invalidate the statute, but instead prohibits its application in that specific context and future similar contexts. *Moore*, 151 Wn.2d at 669.

As explained above, parents and children have fundamental due process rights to their relationships with each other. *Santosky*, 455 U.S. at 753. Thus, a statute interfering with that right must be narrowly drawn or tailored to meet a compelling state interest. *See In re Dependency of I.J.S.*, 128 Wn. App. 108, 116, 114 P.3d 1215 (2005). "Narrowly tailored" means it is the least restrictive means of protecting the government

interest, requiring courts to consider whether lawful alternatives could have been used. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 n.6, 106 S. Ct. 1842, 90 L. Ed. 2d 260 (1986). A parent has a substantive due process right to pursue viable alternatives to involuntary termination or adoption. *In re Welfare of H.Q.*, 182 Wn. App. 541, 552-53, 330 P.3d 195 (2014). However, the Department need not prove the absence of such an alternative option. *R.H.*, 176 Wn. App. at 428.

S.G. concedes the State has a compelling interest in protecting a child from harm. He instead argues that termination of his parental rights is not narrowly drawn to meet that interest—that the trial court was unable to take into account both E.S.G.'s need for legal permanency and a connection to his father.

S.G. argues the Department could have facilitated either a dependency guardianship or a third-party custody order for E.S.G., which could have allowed for a court to determine the appropriate level of contact. Citing *In re Parental Rights to J.B.*, 197 Wn. App. 430, 439, 387 P.3d 1152 (2016), he argues a trial court should weigh the potential for a guardianship when determining whether termination is in the child's best interest. Yet *J.B.* states: "*if a party petitions the juvenile court to place a child with guardians*, the court should weigh the potential guardianship in calculating whether termination element (f) has been established." *Id.* (emphasis added). Under *R.H.*, a court

42

No. 38485-3-III (consolidated with 38486-1-III; 38487-0-III; 38488-8-III)
*In re Welfare of E.J.G.*

considering whether RCW 13.34.180(1)(f) has been met is allowed "to consider the

*proposed* potential guardianship." *J.B.*, 197 Wn. App. at 439 (citing *R.H.*, 176 Wn. App.

at 428-29).

S.G. did not petition to place E.S.G. with guardians or request a third-party custody

order at any point in these proceedings. Thus, although S.G. had a constitutional right to

pursue viable alternatives to termination, he did not do so. Under the case law, the trial

court should weigh the "proposed potential guardianship" when making its decision

regarding termination.[7] Here, there was no proposed potential guardianship.

Further, when the record establishes by clear, cogent, and convincing evidence that

an ongoing relationship between a parent and child is harmful, a parent's as-applied

constitutional challenge cannot succeed. *See In re Dependency of M-.A.F.-S.*, 4 Wn. App.

2d 425, 454-55, 421 P.3d 482 (2018). S.G. emphasizes the GAL's statement that E.S.G.

was attached to him and Ms. Sacco's comment that it would be in E.S.G.'s interest to

---

[7] RCW 13.34.180(1)(f) has been amended to read: "That continuation of the parent and child relationship clearly diminishes the child's prospect for early integration into a stable and permanent home. *In making this determination, the court must consider the efforts taken by the department to support a guardianship and whether a guardianship is available as a permanent option for the child*." LAWS OF 2022, ch. 127, § 2 (effective June 9, 2022) (emphasis added). Because the termination trial occurred before enactment of this amendment and no guardianship was proposed by S.G., the trial court was not required to consider it.

43

have some kind of contact with him in the future. These facts do not negate the clear, cogent, and convincing evidence that an ongoing relationship is harmful. First, the GAL's attachment comment related to the beginning of the proceedings, not the end. Second, Ms. Sacco also testified that E.S.G. looked "like a completely different person" when he left S.G.'s care and was so "much happier." And there was extensive testimony demonstrating that the parent-child relationship was harmful: E.S.G. recreated the violence he witnessed in S.G.'s home and talked about "bad dad" being killed by the police. E.S.G. refused to see his father in the months before trial, showed no interest in pursuing a relationship with him, and had "moved on." He felt uncomfortable about returning to live with S.G. and the violence and trauma that came from it.

Furthermore, as discussed above, the legal relationship between S.G. and E.S.G. precludes adoption—this is harmful in itself in that it prevents permanency. S.G. fails to demonstrate that the termination statute is not narrowly drawn to support the compelling interest of protecting E.S.G. from these harms.

We conclude that S.G. cannot demonstrate that the termination statute was unconstitutional as applied to the facts of this case.

No. 38485-3-III (consolidated with 38486-1-III; 38487-0-III; 38488-8-III)
*In re Welfare of E.J.G.*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, A.C.J.

WE CONCUR:

_____          _____
Fearing, J.                                                      Staab, J.