**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| In the Matter of the Dependency of<br><br>G.E.S.,<br><br>          Minor Child. | No. 82917-3-I (consolidated with No. 82950-5-I)<br><br>PUBLISHED OPINION |

MANN, J. — This is an appeal of an order terminating the parental rights of G.E.S.'s mother and father. Both the mother and father appeal the termination. The mother argues that (1) the statutory rebuttable presumption in RCW 13.34.180(1)(e) unconstitutionally relieves the Department of Children, Youth, and Families (Department) of its burden of proof, (2) that the Department failed to prove by clear, cogent, and convincing evidence that there was little likelihood that conditions would be remedied so that G.E.S. could be returned to her in the foreseeable future, and (3) that the Department failed to prove by clear, cogent, and convincing evidence that all necessary services were expressly and understandably offered to her in satisfaction of RCW 13.34.180(1)(d). The father argues that the Department failed to prove by clear, cogent, and convincing evidence that all necessary services were offered to him in satisfaction of RCW 13.34.180(1)(d). We affirm.

No. 82917-3-I/2

FACTS

A. Background

G.E.S. is the biological child of the mother and father. G.E.S. was eight years old at the time of the 2021 termination trial.[1]

Early morning on June 4, 2019, Everett police detective Molly Spellman and the Everett Police Drug Task Force, executed a search warrant on the parents' home because the father was the subject of a narcotics-dealing investigation. In the home, the police found four adults, G.E.S., and her maternal half sister. The four adults were the mother, her nephew, and two of the nephew's friends. The father was not in the home. The parents had given their nephew permission to host a party at their house the evening before. The party was still going when the mother arrived home from work at midnight. Pictures showed the state of the house. Detective Spellman explained that the house was in a deplorable state: the carpet was filthy, there was trash everywhere, and fruit flies on the trash. G.E.S. was asleep on the living room couch, a few feet away from a man who appeared passed out. On the coffee table next to G.E.S., there was a digital scale, marijuana, methamphetamine residue, a pipe with brown residue, and hypodermic needles. There was minimal food in the kitchen and it smelled of rotting food and refuse. There was old macaroni and cheese on the stove. The garage contained a makeshift sleeping area where officers found additional traces of methamphetamine.

---

[1] The facts are taken largely from the trial court's unchallenged findings of fact. Unchallenged findings of fact are verities on appeal. In re Dependency of J.A.F., 168 Wn. App. 653, 667, 278 P.3d 673 (2012).

No. 82917-3-I/3

There were three upstairs bedrooms in the home.  Two of the bedrooms had soiled mattresses with trash and no bedding.  The third bedroom belonged to the parents and contained trash and what appeared to be jugs full of urine.

The children were removed into protective care due to neglect, uninhabitable living conditions, substance abuse, and lack of safe and stable housing.[2]  That same day, the Department filed a dependency petition under RCW 13.34.030(6)(b).  At the shelter care hearing, the court placed G.E.S. with a family friend with whom she still resides.

B. Services Offered to the Mother

On July 31, 2019, the mother entered into an agreed dependency and dispositional order.  In the order, she agreed to a hair follicle test and, if positive, random urinalysis (UA) tests.  She also agreed to a drug and alcohol evaluation, parenting classes, and a mental health assessment.  The mother's hair follicle test was positive for methamphetamine, heroin, and cocaine.

The Department referred the mother for a drug and alcohol assessment and treatment at Catholic Community Services (CCS).  The mother completed the evaluation in October 2019 and was recommended for intensive outpatient treatment (IOP).  In August 2020, the mother completed an updated drug and alcohol assessment at CCS with Vanita Tucker, a substance use dependency provider.  Tucker recommended the mother complete IOP based on the mother's previous assessment,

---

[2] The Department placed G.E.S.'s half sister with her father and later dismissed her matter. G.E.S.'s half brother was removed by pick up order later that day.  He is not subject to this proceeding. The father also has five other children that reside out of state and are not subject to this proceeding.

the positive hair follicle test, and because the mother had not engaged in any treatment. CCS repeatedly recommended that the mother needed to participate in IOP.

In December 2020, just before the start of the termination trial, the mother began IOP treatment at CCS with Aleis Maxim, a substance use disorder counselor. IOP included group sessions, individual assessments, and UAs. While the mother attended the sessions, she did not want treatment and did not engage in the sessions. During treatment sessions, and during her testimony at trial, the mother continued to deny substance abuse.

The mother was offered random UAs. Random UAs were a necessary service and the Department offered this service throughout the dependency. The UAs that were provided by the mother were negative. The mother failed to provide at least two of the requested UAs, on at least one occasion because the office closed early before she could get there. Maxim suggested she provide UAs through CCS but the mother was not interested in doing so. In order to move out of IOP and into outpatient treatment, the mother needed to complete a random UA. By the time of trial she had not done so.

The Department referred the mother to Compass Health for a mental health assessment. The assessment provider did not recommend the mother complete any additional mental health services. Department social workers Lyndsay Craig and Rose Heilman, offered the mother resources for individual counseling as they both thought it would be beneficial. The mother did not engage in individual counseling.

The mother was offered and engaged in parenting classes through Incredible Years, Triple P, and Family Preservation Services (FPS).[3] The Department referred the

---

[3] FPS is a 90-day service that helps identify specific challenges that a family or caregivers may have. The program normally requires a participating child be in the home with the parent.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

mother to the Incredible Years parenting instruction in September 2019. The mother completed Incredible Years in January 2020. The Incredible Years provider recommended that the mother complete evidence-based parenting classes because the provider had been unable to observe any visits between the mother and G.E.S.

Throughout the first year of the dependency, the mother attended only 10 to 12 of the potential 104 visits with G.E.S. The mother had a challenging work schedule and was caring for the father's deteriorating health. To assist with transportation, the Department provided the mother with an ORCA card (regional transit pass). Social worker Craig also met with the mother to assist her in schedule planning, and how to discuss visitation with her supervisor. The mother failed to have consistent visits with G.E.S. until October 2020.

In October 2020, both parents began visiting G.E.S. at Hand in Hand, a service agency that assists with family time visitation. The Hand in Hand monitor reports showed that the mother was sometimes engaged, brought treats and toys, and played with G.E.S. The reports also showed that the mother was also often late, and not engaged with G.E.S. because she was tired. Once both parents ignored G.E.S.'s request for water.

The Department referred the mother to Triple P parenting instruction in December 2020. The mother began her parenting classes at Triple P with Robert Lee and was still enrolled in the program when the trial started in February 2021. The Triple P sessions were all virtual and Lee did not observe the mother with G.E.S. Lee stopped working with the mother before her completion of the program.

No. 82917-3-I/6

The termination hearing began February 22, 2021. The Department referred the mother to FPS with Simon Walcott on March 21, 2021. The mother was still engaged in FPS when trial resumed in early May 2021.

C. <u>Services Offered to the Father</u>

On October 22, 2019, the trial court found the father in default for not responding to the Department's dependency petition and entered a dependency order. In the father's dispositional order, the court ordered that he complete these services: drug and alcohol evaluation, random UAs, and parenting classes. The court also ordered that the father meet with a social services specialist once a month to discuss case progress.

On October 23, 2019, the court held the first dependency review hearing. The court found that the father was neither in compliance nor had he made progress. Following the hearing, Department social worker Craig approached the father at the courthouse. The father became hostile, stating that he would not complete any of the offered services, and that he had taken every parenting program under the sun.[4] Craig explained that despite any prior parenting classes, the father still needed parenting education because he had not remediated his parenting issues and continued to present troubling parenting behavior during visitation.

Between October 23, 2019, and January 12, 2021, Craig sent the father 12 service letters because of his refusal to meet. The letters listed the father's court-ordered services, explained how to engage in them, provided the social workers' contact information, and stressed the importance of the father's compliance with the court-ordered services. The letters also explained that to be referred to parenting

---

[4] The father did not provide confirmation of prior parenting classes.

-6-

classes, the father needed to contact the Department and have consistent and frequent contact with G.E.S.

In January 2020, the father met with G.E.S. for the first time since the dependency began. The father refused to accept bus tickets to assist in transportation. In 2020, he visited G.E.S. about four times in person. On July 16, 2020, the court held a permanency planning review hearing. The court found that the father was neither in compliance nor making progress.

In August 2020, the Department assigned social worker Heilman to G.E.S.'s case. Heilman came to the parents' home to provide them a copy of the case file. While there, she told the father if he believed that he did not have deficiencies identified by the Department, then he needed to engage in court-ordered services to demonstrate that there were no concerns. She reiterated this point in subsequent meetings.

Heilman met with the father monthly, except for March 2021, when he did not return her calls. The meetings often escalated, resulting in the father yelling and making threats. The father continued to insist that he did not need services. During Heilman's last in-person meeting with the father, the situation escalated resulting in the father blocking the door while airing his grievances with the Department. Afterward, Heilman's supervisor required that she either meet with the father either over the phone or with another social worker present.

During supervised visits with G.E.S. at Hand in Hand, the father often spent much of his time disengaged, either on his cell phone or talking with the mother. During one visit, the father wanted to plug in his cell phone and tried to move a large bookshelf. The father ignored the request from the visit supervisor to stop. The visit

supervisor had to step in to ensure that the bookshelf would not fall on G.E.S. or the father.

From the beginning of the dependency, the father denied having parenting deficiencies and refused to engage in any conversations about services. The father did not complete any UAs for the Department, did not participate in a drug or alcohol assessment, and did not participate in parenting classes, during the dependency.

D. <u>Termination Trial</u>

The termination trial took place over 9 days between February 22 and June 11, 2021.[5] Twenty witnesses testified including the mother, father, social workers Heilman and Craig, the visitation supervisors, and court appointed special advocate (CASA) Leah Green. The mother and father were each represented by counsel. During trial the Department offered assistance including: transportation to court, access to a large screen TV to view the proceedings, and access to a tablet computer with internet access. Both parents refused support or assistance for trial by the Department. The CASA supported termination of parental rights.

The trial court entered 310 findings of fact, concluding that the Department met its burden to terminate the parents' rights. The court found that while the mother was engaged with some services, her progress was minimal and that she had failed to substantially improve her parental deficiencies. The court identified her parental deficiencies as neglect, substance abuse, and lack of parenting skills. The court found that despite her hair follicle testing positive for methamphetamines, cocaine, and heroin,

---

[5] The virtual zoom trial began February 22, 2021. After 3 days, the father became ill and was hospitalized. Trial was postponed until May 4, 2021. After 7 days of testimony, the trial concluded on May 7, 2021. The court's ruling oral ruling was at first scheduled for June 4, 2021, but postponed until June 11, 2021, because the father was hospitalized.

the mother did not engage in IOP until two months before the termination trial and was

not engaged in treatment unless prompted.  The court also found that the mother had

still not taken responsibility for the unsafe environment that her child was in and not

demonstrated that she could be protective.  The court found that the mother lacked the

knowledge and skills to ensure G.E.S.'s safety, despite engaging in three parenting

programs.  The court found that clear, cogent, and convincing evidence established that

there was little likelihood that conditions would be remedied so that the child could be

returned to the mother in the near future.

The court found that the father neither complied with orders nor made progress

throughout the case.  It found that the father exhibited the parental deficiencies of

neglect, substance abuse, lack of parenting skills, and lack of stable housing.  The trial

court also found that the father refused to engage in services.  At trial, the father

testified that he was an adult and could not be told what to do, that he had taken

parenting classes, and that he did not need additional classes.  The court found that the

father was unfit to parent and that there was little likelihood that conditions would be

remedied so that the child could be returned to the father in the near future.[6]

The trial court found that G.E.S. was in a stable home with a family willing to

make their home permanent and adopt.  The court explained further the impact on

G.E.S.:

> [G.E.S] has already been out of home for 24 months.  It is unclear at this
> point how long it would take for the parents to remedy their deficiencies,
> even if they both fully engaged in services, because they both continue to

---

[6] The trial court's findings expressed concern that the mother did not appreciate or recognize the father's clear deficiencies.  At the beginning of trial, the mother testified that she had no plans to leave the father or move out of the home.  While the mother had moved in with a friend when trial resumed in early May, the father testified that when the Department was out of their lives they would resume living together.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 82917-3-I/10

deny the existence of their own and each other's deficiencies. This child can no longer wait for her mother or her father to become safe and suitable parents.

During the last few months, [G.E.S.] has been anxious about where she will live long term.

The parent-child relationship between [G.E.S.] and her mother is detrimental to her well-being, given [G.E.S]'s age and the mother's lack of insight into her own deficiencies as well as the father's deficiencies.

The parent-child relationship between [G.E.S.] and her father is also detrimental to her well-being, given [G.E.S.]'s age and the father's unwavering refusal to correct his parental deficiencies.

Clear, cogent, and convincing evidence establishes that continuation of the parent-child relationship clearly diminishes the child's prospect for early integration into a stable and permanent home.

In addressing the child's best interest, the trial court recognized that the mother and father love G.E.S., and that there was a bond. The trial court, however, stated that "leaving this case open any longer would be to leave it in perpetuity." The court also explained:

[G.E.S] needs stability and a permanent home that can consistently and reliably provide the care the child needs. Neither the mother nor the father can provide that care at this time and will not be able to do so in the near future. The continued parental relationship impedes the child's ability to grow and to develop as a health, well-functioning human being.

The best interest of the child is served by termination. To do anything other than that, based on the admitted evidence and testimony, would leave this child in a perpetual state of not knowing what will happen.

The court found:

It is without a doubt in the best interest of the child that all of the parental rights of [the mother] and [the father] be terminated under RCW 13.24.180 and .190. The court finds this by a preponderance of the evidence, even though the evidence and testimony established it is in the child's interest well beyond that standard.

On July 7, 2021, the court entered an order termination both parents' rights to G.E.S.

No. 82917-3-I/11

Both the mother and father appealed. This court consolidated the cases.

ANALYSIS

A. Standard of Review

An appellate court's role in reviewing a trial court's decision to terminate parental rights is to determine whether substantial evidence supports the trial court's findings of fact by clear, cogent, and convincing evidence. In re Dependency of K.M.M., 186 Wn.2d 466, 477, 379 P.3d 75 (2016). Evidence is substantial if, when viewed in the light most favorable to the party prevailing below—here, the Department—it is such that a rational trier of fact could find the fact in question by a preponderance of the evidence. In re Dependency of M.P., 76 Wn. App. 87, 90-91, 882 P.2d 1180 (1994). Termination proceedings are highly fact-specific and, as such, deference to the trial court is "particularly important." In re Welfare of Hall, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983). We defer to the court's determinations of witness credibility and the persuasiveness of the evidence and will not disturb those findings "unless clear, cogent, and convincing evidence does not exist in the record." In re Dependency of K.R., 128 Wn.2d 129, 144, 904 P.2d 1132 (1995). We review whether the trial court's findings of fact support its conclusions of law de novo. K.M.M., 186 Wn.2d at 477.

B. Terminations Under Chapter 13.34 RCW

Chapter 13.34 RCW creates a two-step framework for terminating parental rights: the first step requires the Department demonstrate that it has satisfied its statutory obligations under RCW 13.34.180(1), and then the court must find by a preponderance of the evidence that a termination order is in the best interest of the child. RCW 13.34.190(1)(b); K.M.M., 186 Wn.2d at 469. "The first step focuses on the adequacy of

-11-

No. 82917-3-I/12

the parents, while the second step looks at the child's best interests." K.M.M., 186

Wn.2d at 478.

A petition seeking termination of parental rights under RCW 13.34.180(1) must

allege all of the following:

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. A parent's failure to substantially improve parental deficiencies within 12 months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. The presumption shall not arise unless the petitioner makes a showing that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided.
> . . . .
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1)(a)-(f).

C. Validity of RCW 13.34.180(1)(e)

The mother argues that the rebuttable presumption in RCW 13.34.180(1)(e) is

unconstitutional because it relieves the Department of its burden of proof. We disagree.

We review constitutional challenges de novo. In re Welfare of A.W., 182 Wn.2d

689, 701, 344 P.3d 1186 (2015). "Statutes are presumed constitutional, and the

-12-

No. 82917-3-I/13

challenger of a statute must prove beyond a reasonable doubt that the statute is unconstitutional." A.W., 182 Wn.2d at 701. Beyond a reasonable doubt describes not an evidentiary burden but a requirement that the mother convince a reviewing court that there is no reasonable doubt that the statute violates the constitution. Island County v. State, 135 Wn.2d 141, 147, 955 P.2d 377 (1998). The mother does not meet this burden.

When a parent's constitutional rights are at stake, courts cannot shift the burden of persuasion onto the parents. See Santosky v. Kramer, 455 U.S. 745, 769, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (holding that the constitution requires the State to prove the necessary factual elements by clear and convincing evidence); In re Termination of Parental Rights to M.A.S.C., 197 Wn.2d 685, 698, 486 P.3d 886 (2021). The Department's burden of persuasion in a termination proceeding is "clear, cogent, and convincing evidence." RCW 13.34.190(1)(a)(i).

When the rebuttable presumption in 13.34.180(1)(e) arises because a parent failed to substantially improve parental deficiencies within 12 months following entry of a dispositional order, it does not alter the Department's burden of persuasion. Even when the presumption applies, the Department retains the burden of convincing the court that it is highly probable that a parent would not have improved in the near future. In re Welfare of C.B., 134 Wn. App. 942, 956, 143 P.3d 846 (2006).

The mother cites C.B. to support her contention, but the case is inapposite. C.B. states that once a court determines that the rebuttable presumption in 13.34.180(1)(e) applies, because it implicates a parent's constitutional rights, the presumption shifts only the burden of production to the parent. C.B., 134 Wn. App. at 955. This is the general

-13-

rule with presumptions, as it is inappropriate to shift the ultimate burden of persuasion where a parent's constitutional rights are at stake. C.B., 134 Wn. App. at 955 (citing Santosky, 455 U.S. at 769). Here, like in C.B., the trial court found that the rebuttable presumption in 13.34.180(1)(e) applied. This application shifted the burden to the mother to produce evidence that she was engaged in services and improving. 134 Wn App at 955. Contrary to the mother's argument, this presumption did not impermissibly shift the burden of persuasion; the Department still retained the burden to persuade the court by clear, cogent, and convincing evidence. The rebuttable presumption in RCW 13.34.180(1)(e) is constitutional.

D. Likelihood That Conditions Will be Remedied

The mother argues that the Department did not prove by clear, cogent, and convincing evidence that there was little likelihood that conditions will be remedied so that G.E.S. could be returned to her in the foreseeable future in satisfaction of 13.34.180(1)(e). We disagree.

The trial court found that the presumption in RCW 13.34.180(1)(e) applied and that it had not been rebutted. The court found further that "[e]ven if the statutory presumption was unavailable, the Department has proven the (e) elements as to the mother by clear, cogent, and convincing evidence."

RCW 13.34.180(1)(e) requires the department prove by clear, cogent, and convincing evidence that "[t]here is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." In determining whether conditions will be remedied, the trial court may consider, but is not limited to, three

No. 82917-3-I/15

delineated factors. See RCW 13.34.180(1)(e)(i)-(iii).[7] Additionally, the trial court can consider the entire parenting history, including a parent's past drug use in determining whether to terminate parental rights. In re Welfare of E.D., 195 Wn. App. 673, 689, 381 P.3d 1230 (2016); In re Dependency of J.C., 130 Wn.2d 418, 428, 924 P.2d 21 (1996). The focus of RCW 13.34.180(1)(e) is whether parental deficiencies have been corrected. In re Dependency of D.A., 124 Wn. App. 644, 655, 102 P.3d 847 (2004).

Clear, cogent, and convincing evidence supports the trial court's findings that there is little likelihood that conditions will be remedied so that the child can be returned to the mother in the near future. First, the mother denies drug use and has not taken the appropriate steps to address it. Second, the mother failed to recognize that she was not providing a safe environment for G.E.S., nor that she was willing to make the necessary changes to obtain it. Finally, the mother failed to recognize that the father posed a threat to G.E.S.'s safety.

---

[7] In determining whether conditions will be remedied, the trial court can consider:

(i) Use of intoxicating or controlled substances so as to render the parent incapable of providing proper care for the child for extended periods of time or for periods of time that present a risk of imminent harm to the child, and documented unwillingness of the parent to receive and complete treatment or documented multiple failed treatment attempts;

(ii) Psychological incapacity or mental deficiency of the parent that is so severe and chronic as to render the parent incapable of providing proper care for the child for extended periods of time or for periods of time that present a risk of imminent harm to the child, and documented unwillingness of the parent to receive and complete treatment or documentation that there is no treatment that can render the parent capable of providing proper care for the child in the near future; or

(iii) Failure of the parent to have contact with the child for an extended period of time after the filing of the dependency petition if the parent was provided an opportunity to have a relationship with the child by the department or the court and received documented notice of the potential consequences of this failure, except that the actual inability of a parent to have visitation with the child including, but not limited to, mitigating circumstances such as a parent's current or prior incarceration or service in the military does not in and of itself constitute failure to have contact with the child.

RCW 13.34.180(1)(e)(i)-(iii).

-15-

The mother first failed her hair follicle test ordered by the agreed dependency order. Following this failure, the Department provided, and the mother completed, three drug and alcohol assessments, all of which recommended IOP. The mother did not engage in IOP until less than a month before trial, and refused to complete the UA that would have allowed her to move forward in the program. Despite the mother's failed hair follicle test, her participation in three drug and alcohol assessments, and her delayed enrollment in IOP, she still stated that she "has never done drugs a day in [her] life," and that IOP was for a "habit [she does not] have." The delay in IOP enrollment, combined with the mother's denial of drug usage,[8] demonstrates that there is little likelihood this condition will be remedied so that G.E.S. can be returned to the mother in the near future.

Despite participation in services offered by the Department, the mother neither demonstrated the insight into providing a safe environment for G.E.S., nor was she willing to make the necessary changes to obtain it. The Triple P provider testified that despite the mother's attendance, she failed to demonstrate that she could maintain a safe home for G.E.S. Both of the Department's assigned social workers testified that, despite being offered services, the mother had not made real progress because of a lack of motivation to make the necessary changes in her life. The mother did not recognize the risks that G.E.S. living in a home with drugs, paraphernalia, and

---

[8] The Department relies heavily on the mother's few missed UAs and refusal to participate in a final UA to assert that there is little likelihood that she will remedy her drug usage for G.E.S.'s return. While missing appointments for random UAs may indicate the parent continues to use drugs, we also recognize that a working parent may miss such appointments simply because she lacks adequate transportation. Ultimately, the reason a parent missed UAs is a fact question for the trial court to make. But here, the mother's complete denial of drug usage, in the face of the positive hair follicle test, supports the trial court's finding that there is an on-going drug use problem rendering her incapable of providing care for G.E.S. RCW 13.34.180(1)(e)(i).

substance using individuals could pose to G.E.S. When asked what the mother could improve as a parent, she only acknowledged that she needed to improve her patience. Clear, cogent, and convincing evidence supports that throughout the timeline of this proceeding, the mother did not demonstrate insight to provide a safe environment for G.E.S., and that there is little likelihood this condition will be remedied so that G.E.S. can be returned in the near future.

The mother also continued to lack recognition that the father exhibited unsafe parenting practices. While in her parents' joint care, G.E.S. missed over 55 days of school—over a third of the academic year. The father allowed G.E.S. to make decisions as to whether or not to attend school. While in his care, the father believed G.E.S. should take care of herself. The father taught his children that they are responsible for their own decisions, but those decisions have consequences. The mother asserted that the dangers cited in the petition for terminating the father's parental rights were lies. Rather, she stated that she had no concerns about the father being around G.E.S. When asked about her relationship with the father, she stated that it was fine, that he never used drugs, and that his criminal conviction was false. The mother maintained these opinions despite the father allowed G.E.S. to decide whether to attend school, withheld food as a punishment, was unwilling to participate in services offered by the Department during this proceeding, and was the focus of a narcotics investigation. Clear, cogent, and convincing evidence supports that up to the date of trial, the mother did not recognize the risk posed by the father's behavior and parenting practices, and that there is little likelihood this condition will be remedied so that G.E.S. can be returned in the near future.

-17-

While recognizing that the mother had made some efforts to correct her parenting deficiencies and made progress towards reunification, over the two years leading to termination, those efforts fell short. The trial court's determination does not ignore the mother's efforts, but rather focuses on their sufficiency as it relates to G.E.S.'s stability and future well-being. Thus, not only did the mother fail to overcome the rebuttable presumption in RCW 13.34.180(1)(e), clear, cogent, and convincing evidence supports the trial court's findings and conclusion that even without the statutory presumption, the provision was satisfied.

E. Necessary Services Expressly and Understandably Offered

Both parents argue that the Department did not prove by clear, cogent, and convincing evidence that it expressly and understandably offered all necessary services to them in satisfaction of RCW 13.34.180(1)(d). We disagree.

RCW 13.34.180(1)(d) requires the Department to prove:

That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided.

The focus of this provision is to ensure that the Department provides remedial services that are necessary, available, and capable of correcting parental deficiencies in the foreseeable future. In re Dependency of T.R., 108 Wn. App. 149, 164, 29 P.3d 1275 (2001). A service is "necessary" if it is required to address a condition that precludes reunification with the child. Matter of K.M.M., 186 Wn.2d 466, 480, 379 P.3d 75 (2016). These services must be tailored to an individual parent's needs. Matter of D.H., 195 Wn.2d 710, 727, 464 P.3d 215 (2020). The court "may consider any service

received, from whatever source, bearing on the potential correction of parental deficiencies." D.A., 124 Wn. App. at 651-52.

Because the parents each raise arguments related to RCW 13.34.180(d), we address each individually.

### 1. The Mother

The mother first challenges the trial court's finding that FPS was not a necessary service. Substantial evidence rebuts this challenge.

The evidence supports a finding that FPS was neither appropriate nor likely to correct the mother's parental deficiencies. See. In re Dep of G.L.L., 20 Wn. App. 2d 425, 432, 499 P.3d 984 (2021). Here, the mother had already engaged in two parenting classes and had not made progress. Following the parenting classes, the mother did not prioritize reunification efforts and failed to acknowledge culpability for G.E.S.'s removal. The mother did not acknowledge the importance of a safe home environment and denied the unsafe nature of the father's parenting decisions. This record supports the trial court's finding that FPS would not remedy the mother's parental deficiencies.

Additionally, the record also supports the trial courts' finding that FPS was not appropriate in this case as the program is tailored to children who live with their parents and the child here was not living with the mother and unlikely to do so in the foreseeable future. The trial court found that giving the mother more time to complete FPS would not remedy her parental deficiencies because she could not take advantage of the in-home parenting service that FPS provided. This finding is also supported by the record.

The mother also contends that the Department failed to offer her a domestic violence assessment. While it is undisputed that the Department did not offer a

domestic violence evaluation to the mother, the record supports the trial court's finding that a domestic violence evaluation was not a necessary service.

The mother bases her contention on the social workers' comments that her greatest barrier to reunification is her inability to understand what makes the father an unsafe caregiver and her inability to develop an effective means of protecting G.E.S. from this environment. Additionally, social worker Heilman stated that there appeared to be elements of power and control between the spouses. The mother extrapolates these statements to insist that the Department believed that she was the victim of domestic violence.

But as the Department explained, the mother mischaracterizes the Department's stance on her relationship with the father. The Department highlighted the mother's inability to recognize the father's lack of parenting skills, such as withholding food as punishment or allowing G.E.S. too much autonomy to make adult decisions. This lack of recognition in turn led to an unsafe environment for G.E.S. Heilman's statement on power and control were not implying the presence of domestic violence, but rather that the mother could not recognize the qualities that made the father an unsafe caregiver for G.E.S.

While Heilman testified to feeling nervous around the father because he was agitated around her, there was no evidence at trial of any domestic violence between the mother and father. Moreover, the mother testified at trial that she would not benefit from such a domestic violence evaluation. The record supports the trial court's finding that a domestic violence evaluation would not have remedied the mother's parental deficiencies in the near future.

No. 82917-3-I/21

When the Department inexcusably fails to offer services to a willing parent, termination may still be appropriate if the services "would not remedy the parent's deficiencies in the foreseeable future, which depends on the age of the child." K.M.M., 186 Wn.2d at 486. The foreseeable future "is determined from the point of view of the child," and is dependent on the child's age and placement. K.M.M., 186 Wn.2d at 486; In re Welfare of T.B., 150 Wn. App. 599, 609-10, 209 P.3d 497 (2009). Similarly, "where the record establishes that the offer of services would be futile, the trial court can make a finding that the Department has offered all reasonable services." In re Welfare of M.R.H., 145 Wn. App. 10, 25, 188 P.3d 510 (2008).

The Department contends that the foreseeable future for G.E.S. is, at most, six months. Heilman testified that G.E.S. needs permanency. Permanency removes the turbulence of the foster care system and would allow G.E.S. to resettle either in her reunified life or to make a new, permanent one. In the 23 months since the Department removed G.E.S. from her home, the mother has made little progress in addressing her deficiencies. She had confirmed drug use and was recommended IOP three times. She only engaged in IOP two months before trial, did not actively engage, and refused to complete her final UA. The mother also did not demonstrate an understanding of the safety issues that the father and the current care that the parents were giving to G.E.S. put her at risk. The mother had nearly two years to address barriers to reunification with G.E.S.; a domestic violence assessment would not have remedied these deficiencies within the foreseeable future.

-21-

Clear, cogent, and convincing evidence supports the trial court's findings and conclusions that all necessary services were expressly and understandably offered to the mother in satisfaction of RCW 13.34.180(1)(d).

### 2. The Father

The father also argues that the Department did not expressly and understandably offer him services in satisfaction of RCW 13.34.180(1)(d). He relies on Hall for the proposition that the Department did not expressly and understandably offer him services because it did not provide him with a parenting class provider list. 99 Wn.2d at 864. The father's argument, however, discounts that the Department offered him ample services throughout the length of the case, all of which he ignored or refused.

The Department provided the father with ample opportunity to participate in services. On July 5, 2019, August 8, 2019, September 9, 2019, and October 4, 2019, Craig sent the father letters recommending that he engage in drug and alcohol evaluation, parenting classes, and random UAs. On more than one occasion, the court ordered that the father participate in services, but he never complied. Between October 23, 2019, and January 12, 2021, Craig sent the father 12 service letters providing him with information and offering assistance regarding services. After Heilman took over the case, she continued to insist that the father participate in services. Even at trial, the father insisted that he was an adult that could not be told what to do and that he did not need parenting classes.

Clear, cogent, and convincing evidence supports the trial court's findings and conclusions that all necessary services were expressly and understandably offered to the father in satisfaction of RCW 13.34.180(1)(d).

No. 82917-3-I/23

    Affirmed.

_Mann, J._

WE CONCUR:

_Coburn, J._        _Andrus, C.J._